983 A.2d 434

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Richard Nelson FOLTZ, III.

Misc. Docket AG No. 24, Sept. Term, 2008.

Court of Appeals of Maryland.

Nov. 13, 2009.

Dolores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n of Maryland), for Petitioner.

Richard Nelson Foltz, III, Baltimore, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BATTAGLIA, J.

Richard N. Foltz, III, ("Mr. Foltz" or "Respondent"), was admitted to the Bar of this Court on June 1, 1977. On September 15, 2008, Bar Counsel, acting on behalf of the Attorney Grievance Commission, Petitioner, pursuant to Rule 16–751(a),[1] filed a petition for disciplinary action against Mr. Foltz, charging several violations of the Maryland Rules of Professional Conduct ("MRPC"), including MRPC 1.15 (Safe-keeping Property),[2] MRPC 8.4(a), (c), and (d) (Misconduct),[3]

---

1. Rule 16–751(a)(1) provides:

 (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of the Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Rule 1.15 provides:

 (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

 (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

 (c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

and Rule 16–607 (Commingling of Funds).[4] The factual bases

---

This version of Rule 1.15 became effective January 1, 1997 and was in effect during the time the acts in question occurred. By Rules Order dated February 8, 2005, effective July 1, 2005, subsections (b) and (c) were substantially amended, and subsections (d) and (e) were added. Rule 1.15 was subsequently amended by Rules Order dated March 12, 2007, effective January 1, 2008, and currently reads:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

(b) A lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607 b.

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

(a) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

(e) When a lawyer in the course of representing a client is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall distribute promptly all portions of the property as to which the interests are not in dispute.

**3.** Rule 8.4 provides in pertinent part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice; ...

**4.** Rule 16–607 provides:

of the charges involved a defamation suit initiated by Respondent in 1999 against David and Theresa DeCenzo, and a counterclaim filed by them, upon which in 2001, after a jury trial, a judgment was entered against Mr. Foltz for approximately $386,000, which by 2007 had grown to over $431,000; Respondent claimed to be insolvent during this time period, while utilizing monies in his escrow account and joint business accounts funded by his law office, for personal expenses, allegedly to avoid payment of the DeCenzos' judgment. This Court referred the matter to the Honorable John Addison Howard of the Circuit Court for Baltimore City for a hearing to determine findings of fact and conclusions of law pursuant to Rule 16–757.[5]

---

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.** 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

By order dated June 5, 1996, effective January 1, 1997, this Rule, formerly BU7, was renumbered to its current iteration.

5. Rule 16–757 provides:

(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days

On March 6 and 9, 2009, Judge Howard held evidentiary hearings, during which Mr. Foltz represented himself, and on April 24, 2009, he issued Findings of Fact and Conclusions of Law, in which he found, by clear and convincing evidence, that Mr. Foltz's acts and omissions constituted violations of MRPC 1.15 and 8.4(a), (c), and (d), as well as Rule 16–607. In so doing, Judge Howard made the following findings of fact regarding Mr. Foltz's background, law practice, and business ventures: [6]

Respondent was born in 1953. He was admitted to the Maryland Bar in 1977. He is not admitted in any other jurisdiction. Respondent has a Master's Degree in taxation and a Master's Degree in Business Administration. He has been a sole practitioner since 1983 or 1984, when he formed a professional corporation, the Law Offices of Richard N.

---

after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.

(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

(c) **Transcript.** The petitioner shall cause a transcript of the hearing to be prepared and included in the record.

(b) **Transmittal of record.** Unless a different time is ordered by the Court of Appeals, the clerk shall transmit the record to the Court of Appeals within 15 days after the statement of findings and conclusions is filed.

**6.** All references to transcripts and exhibits have been omitted.

Foltz, III, Chartered, (hereafter "the Law Office"). His practice consisted primarily of business related matters, wills, trusts, estates, corporations, and real estate matters. He was a licensed real estate broker. He also handled civil litigation and minor criminal matters and personal injury cases.[1]

Up until recently, Respondent maintained his office for the practice of law in the basement of 11 Ivy Bridge Court, Reisterstown, Maryland, which was both his residence and marital home. During times relevant to this matter, Respondent also operated an entity, the Small Business Advisory Group, Inc., (hereafter "the SBAG"), at the same location. SBAG was owned by Respondent and his wife, Deborah I. Foltz, as tenants-by-the-entireties.

SBAG was a C corporation from which deductions for medical expenses could be made. Some fees for business consulting which Respondent received and which would otherwise have been received by his law practice were credited to SBAG.

During the period dating back five years prior to 2007, the period during which the acts giving rise to this proceeding occurred, Respondent appears to have made all decisions of substance relating to the operation of either corporation. This results from his denial that his wife's involvement during that time, was of any significance. She did not make decisions relating to their operation, and of greatest importance, to whom checks were made or the manner in which those checks were paid.

1. [In this footnote, the hearing judge referred to the citation format to the transcript of the proceedings, which we have not repeated.]

Judge Howard then described the DeCenzo lawsuit giving rise to the judgment and collection efforts against Mr. Foltz:

In 1999, Respondent and his wife, filed a defamation action in the Circuit Court for Baltimore County against Teresa and David DeCenzo, (hereafter "the DeCenzos"), for defamation in the Circuit Court for Baltimore County. The DeCenzos brought a counter-claim against the Respondent

on behalf of their minor daughter. Respondent was represented by counsel in the litigation.

In July and August 2000, the matter was tried by a jury. The jury found in favor of the DeCenzos and ultimately a judgment was entered in their favor on May 18, 2001. The judgment included $386,350 for compensatory damages and $75,000 for punitive damages. Interest accrued from August 7, 2000. Judgments for the DeCenzos were entered as to all claims made by Respondent and his wife. The case was affirmed on appeal.

The DeCenzos' attorney, Andrew D. Freeman, Esquire, (hereafter "Freeman"), as well as other attorneys from his firm of Brown, Goldstein & Levy, commenced post-judgment proceedings against Respondent. Although there have been efforts to collect the judgment they have never been fully satisfied.

Freeman testified Respondent never manifested an interest in amicably satisfying the claim. In discovery relating to collection of the judgment, Respondent denied receiving income from either the Law Office, the SBAG or any other source until subsequent litigation in 2006. As to other assets, Respondent claimed not to have any other than the residence on Ivy Bridge Court which was owned as tenants-by-the-entireties by the Respondent and his wife. Collection efforts did result in the identification and sale of assets, including a car, a gun collection and an investment property.[2] Attachments were also levied against some bank accounts and an investment account with or held by an entity identified as "IFG." The collection efforts resulted in recoveries of approximately $55,000.

At various times after August 2000, Writs of Garnishment were served on both the Law Office and SBAG for money owed by those entities to Respondent. Discovery was also pursued. On or about November 16, 2001, the DeCenzos' lawyers filed a Motion to Compel Discovery Responses from Respondent and, on December 12, 2001, a Motion to hold Respondent and the Law Office in contempt was filed. Respondent did not respond, which resulted in the Circuit

Court issuing a body attachment with Respondent being taken into custody. The court held the contempt proceeding in abeyance and allowed Respondent to produce the requested documents.

2. Respondent claimed that, although he was still in possession of the gun collection, he had given it away. The DeCenzos were able to prove that Respondent still owned the gun collection and sold it at auction. The property known as Stafford was titled in the names of Respondent and another individual. Respondent, however, claimed the property was owned by a partnership and that his interest in the property was substantially reduced. The matter was litigated and the court agreed that the title to the property was in fact the way the property was owned.

Judge Howard noted that despite collection efforts, the judgment remained unsatisfied in 2005, resulting in the filing of a new action by the DeCenzos against Mr. Foltz, his wife, and his business entities:

In 2005, the DeCenzos filed a new action naming Respondent, his wife, the Law Office and SBAG as defendants. The action alleged violations of the Fraudulent Conveyance Act. Discovery in the action directed to Respondent sought lists of income and assets, production of personal income tax records and tax records for the Law Office and SBAG. In response, Respondent provided one joint personal income tax return for the year 2004, and the tax returns for the Law Office and SBAG for 1990 through 2004. The business returns for the Law Office and SBAG from 2000 through 2004 were all signed by Respondent and bore the same date of preparation, May 16, 2005. Respondent was asked to sign a waiver for the Plaintiffs to obtain his personal returns directly from the Internal Revenue Service. He refused to do so.[3]

In discovery Freeman learned there was a mortgage on the Ivy Bridge residence owned and occupied by Respondent and his wife, but none of the produced records explained how the mortgage was being paid. On March 14, 2006, a subpoena was sent to CitiBank, the mortgagee of the Ivy Bridge property seeking its payment records. These records provided evidence that, in 2004 and 2005, the Ivy Bridge mortgage payments were made from a checking

account titled: the Law Office of Richard N. Foltz, III, Chartered Defined Benefit Pension Plan, (hereafter "the pension plan account").

Freeman stated, Respondent testified in the fraudulent conveyance action that the only funds in the pension plan were deposited before 1999 and that he used the pension plan bank account and other accounts to avoid having a checking account in his own name. In this way he did not have an account the DeCenzos could garnish. Respondent also testified that he had borrowed money from his Pension Plan for personal purposes, possibly including payment of the mortgage, but produced no evidence to document any loan as would normally have been required when a loan is made from a qualified pension plan.

In check registers for bank accounts of both the Law Office and the SBAG, obtained in discovery by Freeman, there was evidence that large sums of money were disbursed to Respondent and his wife. Freeman identified a series of transactions on the SBAG check register, which shows that a deposit of $46,905 was made to the SBAG bank account on March 1, 2002. This deposit resulted in an account balance of $47,569. The deposit was designated "income real estate" on the check register. That same day the following checks were issued: $25,000 to Deborah Foltz; $10,000 to the Law Office and $1,000 to Respondent and Deborah Foltz as tenants-by-the-entireties. The disbursement to the Law Office was designated "loan." The disbursements to Respondent and his wife were originally designated "dividends" on the check register. When Respondent prepared the tax return for SBAG in May 2005, he characterized the disbursements to him and his wife as "rent."

3. Although Petitioner asked Respondent to provide his personal income tax returns for 2000 through 2006, Respondent failed to do so.

The fraudulent conveyance action resulted in a judgment in the amount of $431,000 in favor of the DeCenzos. The judgment was against all defendants, jointly and severally. The Defendants included Respondent, his wife, the SBAG

and the Law Office. It was upheld on appeal. The factual merits of the claims giving rise to either the original judgment or the second judgment are not relevant to the findings in this matter, except that their existence provides context to the immediate claims against Respondent.

The DeCenzos executed on the jointly held Ivy Bridge property. Mrs. Foltz filed for bankruptcy and the trustee sold the house. The DeCenzos received the proceeds which satisfied the fraudulent conveyance judgment. The judgment against Respondent, individually, from the first case has, as of the date of the hearings in this matter, not been fully satisfied.

Judge Howard then described the testimony of Robert A. Garvey, Petitioner's forensic accounting expert, regarding disbursements to Mr. Foltz and his wife or his wife individually from Mr. Foltz's law office account and from an entity owned by Mr. Foltz and his wife, the Small Business Advisory Group, purportedly for rental payments related to the use of a basement office in the Foltz's residence:

Robert A. Garvey, Jr., (hereafter "Garvey"), was called by the Petitioner and qualified as an expert in accounting, forensic accounting and fraud examination. Garvey identified disbursements made from both the Law Office and the Small Business Advisory Group to Respondent and his wife or his wife individually during 2001 and 2002. These disbursements totaled $58,825 in 2001 and $45,195 in 2002 and purported to be payments for rent by the corporate entities for use of the basement of the Ivy Bridge residence.

Garvey reviewed a document titled Agreement of Lease, dated February 1, 1989, which had been produced by Respondent. It is between the Law Office and the Respondent and his wife, as tenants-by-the-entireties, for the basement area of the Ivy Bridge residence. The terms of the lease call for monthly payments in the amount of $2,000 per month.

In Garvey's opinion, the disbursements from the corporate entities checking accounts were not consistent with

rent payments in connection with a landlord-tenant relationship for several reasons. First, the disbursements were not consistent with the terms of the lease. The lease called for monthly payments in the amount of $2,000, however, the disbursements were for different amounts, for example, the $33,000 disbursement on April 5, 2001. The lease required rent to be paid on the first day of each month. The disbursements allegedly for rent, were not paid consistent with the terms of the lease; e.g. they were, for the most part, paid on different days of the month and occasionally at multiple times during the same month and at no time appeared to be consistent with the current payment of rent. They appeared more to be made in the manner of payments fitting a description of "if paid" as opposed to payments made consistent with any obligation to pay rent under the terms of the lease. The Law Office made payment for utilities; although the lease called for the landlord to furnish them at the landlord's expense. In Garvey's opinion the distributions for rent were actually disguised disbursements to Respondent as an individual.

Garvey found further evidence the disbursements were not for actual rent payments as a result of the fact income tax records for both the Law Office from 1991 through 2004 and SBAG from 1991 through 2004, show no deduction for the payment of rent in most years prior to the entry of judgment, 1991 through 2000. No rent payments were claimed by the Law Office except for $5,000 paid in 1993. SBAG claimed to have paid rent of $3,500 in 1991, $1,500 in 1992, $12,000 in 1994 and $200 in 2000. What is most curious about the SBAG's payment of rent is that it is not a party to the lease pursuant to which rent was allegedly paid, and no other lease or agreement was provided supporting any obligation on the part of the SBAG to pay rent. Although Garvey opined and the records clearly demonstrate there were sufficient funds available to the Law Office to pay rent in years prior to 2001 there is no information in the record which explains why only after collection efforts were initiated did the apparent payment of

rent begin in earnest. Furthermore, Respondent's records do not include any document or other record that either Respondent or his wife claimed to be owed any unpaid rent.

Based on his review of the detailed general ledger produced by Respondent, Garvey identified instances in year 2000 when Respondent transferred cash from his personal accounts to the Law Office account and from the Law Office trust/escrow account to the Law Office. The records show transfers of $30,600 and $12,157 from Respondent and/or his wife to the Law Office. Of the $12,157, $3,000 came from a property management account. That same year, there was also a transfer from Respondent's trust/escrow account to the Law Office in the amount of $44,000 and a note payable in this amount to Michael Spindler. In 2000, Respondent's records reflect that the Law Office paid dividends in the amount of $33,041. This occurred during a time when the revenues from the Law Office were less than in prior years.

Garvey found no record that Mrs. Foltz was paid a salary as an employee by either the Law Office or the SBAG and that there was no record that either entity owed Mrs. Foltz deferred compensation.

The hearing judge also made findings regarding disbursements between 2001 and 2006 from Mr. Foltz's pension plan checking account, which had been used to pay personal expenses:

Garvey reviewed the original and the modified pension plan documents, bank statements for the pension plan account and cancelled checks written on this account. He prepared a spreadsheet showing the disbursements from the account from April 26, 2001 until April 13, 2006. From August 2003 to February 16, 2006, more than $70,000 was disbursed from the pension plan checking to pay the mortgage on the Ivy Bridge property.

Respondent also disbursed funds from the pension plan checking account to himself, his law office, his escrow account, Baltimore Gas & Electric, Home Depot, Sam's Club, Director of Finance, a plumbing company, and a

doctor. Disbursements were also made from this account to Auroa Loan Services and Midland Mortgage during 2005 and 2006.

In Garvey's expert opinion it is inappropriate to make such disbursements from a pension plan and that the disbursements were not in accordance with the pension plan agreement. The pension plan allowed Respondent to withdraw cash only as pension benefits or as a loan and allowed the trustee to lend a participant up to the lesser of $50,000 or one-half of its vested portion of the accrued benefits. The loan must be documented in writing and must be repaid within 5 years. The loan must also be collateralized with up to 125% of the borrowed amount and it must bear interest. Records provided by Respondent did not include a written loan agreement and Respondent had represented that he had no assets to use as collateral for a loan or loans from the pension plan. The disbursements from the pension plan account were not consistent with the payment of pension benefits.

Judge Howard further found that Mr. Foltz used business credit cards for personal expenses:

Garvey observed that credit card payments were made from the Law Office and the SBAG. The itemized balance sheet for the SBAG showed a liability to the credit card company at the end of 2000 of $1,441.72.[4] The balance owed by the Law Office was zero. On January 17, 2001, a check was issued from the SBAG bank account to Wells Fargo for payment of a credit card balance in the amount of $3,181.56. This amount overpaid the credit card balance owed by both the Law Office and SBAG. In January of 2001, only $100 worth of business type charges were recorded on the books. In February 2001, another check was issued to Wells Fargo from the SBAG account for $1,045.60, which again paid more than the amount of business charges to the credit card that month. An examination of the credit card statements showed that there were a number of expenditures, especially in the month of January 2001, that were not the type of expenditures that Garvey would normally expect to see on a

business credit card. For example, there was a Peeble's Department Store, K–Mart and similar businesses. Business funds were being used to pay for expenses which were not business charges, since these expenditures did not appear on the business books. There were no records indicating that Respondent and/or his wife were reimbursing the SBAG for the payments to Wells Fargo.

4. The transcript of Garvey's testimony, contains an error in that it inaccurately reflects this figure to be $14,041.72. I have listened to the record and that was the testimony.

Judge Howard also found that from 2000 to 2007, Mr. Foltz had used his escrow account, not only for client matters, but to contain monies related to various rental properties, to his pension plan, and a loan of $200,000 from a Michael W. Spindler:

In July 2007, John DeBone, (hereafter "DeBone"), a paralegal employed in the office of Petitioner, was assigned to review records for a bank account titled the Law Office of Richard N. Foltz, III, Chartered, Attorney Trust Account IOLTA, (hereafter "Attorney Trust Account"), for the period January 2000 through 2007.

During Petitioner's investigation, Respondent provided the check register and records kept as sub-accounts for the Attorney Trust Account. DeBone observed from these records that personal funds had been deposited into the Attorney Trust Account. One of these sub-accounts was titled "Law Office Register." One of the entries in this sub-account is the deposit of $500 from the Law Office account.

Respondent told DeBone that he had received a loan of $200,000 from Michael W. Spindler, (hereafter "Spindler"). The funds appeared on an Attorney Trust Account ledger/subaccount titled "Michael W. Spindler." On February 3, 2000, the balance in this Attorney Trust Account sub-account was $125,000. On that date, $10,000 was disbursed to Respondent. This transaction was designated "loan." Respondent maintained the proceeds of the loan from Spindler in his Attorney Trust Account and disbursed those funds from the account for personal purposes. The majori-

ty of the funds in this sub-account went directly to Respondent: check 455 for $10,000; check 456 for $5,750; check 461 for $10,000; check 466 for $20,000; check 470 for $20,000. A check in the amount of $35,000 was payable to the Law Office of Richard N. Foltz. These disbursements began on February 3, 2000 and ended on June 17, 2005.

Respondent also maintained a sub-account in the Attorney Trust Account titled "Property Management Register." Respondent told DeBone that he had three rental properties and that the transactions in this sub-account related to these rental properties known as: Stafford, Newfield and Westowne. The records reflected that between January 2002 and August 2005, Respondent deposited rent payments into, and paid expenses from, his Attorney Trust Account relating to his property management business.

Respondent also maintained a sub-account titled "RNF & DIF–TE Register." This sub-account begins on January 3, 2003 with a bookkeeping entry for $7,100 reflecting a transfer of funds from the property management sub-account to this sub-account. On January 14 and March 5, 2003, Respondent deposited funds from the pension plan bank account to the Attorney Trust Account. Each of these deposits was for $10,000 and recorded in the RNF & DIF–TE sub-account. The deposits were not designated as loans on the register and the checks themselves have no notation indicating a loan. One of the checks has a memo which states "Transfer to Escrow."

Some of the disbursements from the trust account listed on the RNF & DIF–TE Register are to Respondent. Two of these disbursements are designated "loan." Three disbursements were made to Respondent and wife. A disbursement to Erie Insurance in the amount of $631.50 on August 29, 2003 was also designated "loan." There are some disbursements to Saturn of Owings Mills, Beltway Shell and Sam's Club. Some of the disbursements indicate that they are for Westowne. Disbursements in January and March 2003 were made to First Nationwide Mortgage. Deposits from Respondent were made to the trust account

on April 17 and 23, 2003. These transactions were clearly personal in nature and not related to any client matters.

During the time Respondent was using the Attorney Trust Account for transactions related to his rental properties, his pension plan account and the loan from Spindler, he was also using the account for client matters. DeBone identified deposits to the Attorney Trust Account related to client matters totaling over $1 million from January 2000 through September 2005. After September 15, 2005, there was virtually no activity in the Attorney Trust Account.

Judge Howard continued, describing the testimony of June Rusterholtz, Mr. Foltz's bookkeeper, who had been called by Mr. Foltz:

June Rusterholtz, (hereafter "Rusterholtz"), was called by Respondent. She has been employed as a bookkeeper by Respondent's law office and the SBAG as an independent contractor since about 1990. She has no legal education, is not a CPA and had no formal accounting education. The accounting system used by Respondent was in place when she came to work for him. Respondent showed her how to keep the books.

After the judgment was entered against Respondent, he discussed this fact with Rusterholtz and, thereafter, they anticipated the business records would be looked at with a "fine microscope" and took care to do everything correctly and to correct any mistakes. Before the lawsuit, Respondent would go through the entries made by Rusterholtz at the end of every month and corrections would be made. After the lawsuit, it would be two, three or four months before she and Respondent would go back and change the entries around. According to Rusterholtz, she entered checks in the Attorney Trust Account Law Office sub-account when she did not know what other sub-account to use. This was temporary, however, until the corrections were made.

Rusterholtz never observed records being hidden, changed or falsified. Respondent instructed her to tell the

lawyers for the DeCenzos and Petitioner what she knew and to answer any questions.

Rusterholtz kept records for three credit cards: a personal card; a law office card and a SBAG card. When the statements came in, Respondent would go through the statements and color-code the charges as to whether the charge was for the Law Office, SBAG or personal.

Rusterholtz would prepare the checks, but she was not authorized to sign the checks as the payor. Respondent decided when money would be moved from the SBAG account to the Law Office account. She never issued a check without his authorization.

Throughout her testimony Rusterholtz used the pronoun "we" when answering questions to refer to herself and Respondent. Rusterholtz and Respondent have a close relationship. There were times when she worked without pay for the Respondent.

Rusterholtz recalled that, after the sale of Westowne to the pension plan, the pension plan account was used for rent deposits and expenses. According to Rusterholtz, a separate property management account was used for the rent and expenses for the property management business prior to the transfer of the property to the pension plan.[5] Rusterholtz, however, identified transactions in the Attorney Trust Account as related to Westowne. Respondent would decide what checking account to use to pay expenses for the rental properties.

5. While a separate property management account may also have been used for the rental property business prior to the transfer of the Westowne property on December 31, 2003, the financial records reflect that property management transactions for Westowne went through the Attorney Trust Account from January 2002 through December 2004.

Judge Howard, finally, described what Mr. Foltz presented in his own testimony:

Respondent testified on his own behalf. On October 2, 1998, the DeCenzos accused him of molesting their child, a playmate of his daughter.[6] Following that Respondent initiated the litigation referred to previously which led to a

judgment in favor of the DeCenzos on their counter-claim. Respondent contends that as a direct consequence of the litigation he lost his family, law practice, pension, reputation, career, business and ability to earn a living, and that defending the allegations left less time for him to work in the office and attend to bookkeeping matters.

Respondent testified after the entry of the judgment, presumed to be the one entered in May 2001, that a joint account he had with his wife was wrongfully attached by the DeCenzos and the attachment was not lifted until two years later. This, he explained, prevented him from having a personal account into which to transfer funds from his pension account.

Respondent denied refusing to provide tax returns in any of the proceedings. He claims the personal joint returns for 2004 and 2005 were never in his possession, as they were prepared and filed by his wife, and that he is unable to obtain those returns because his ex-wife no longer has them in her possession.

According to Respondent, he did not voluntarily pay the DeCenzos because he was unable to do so.[7] The only assets he had were the stock from the two corporations, the Law Office and the SBAG, and the Ivy Bridge property. The stock had substantially no value and was pledged as collateral to Spindler for loans. Although there was considerable equity in the Ivy Bridge property, it was held as tenants-by-the-entireties with his wife. It was therefore exempt as a matter of law. In 2008, the house was sold without Respondent's knowledge or consent as a result of his wife's bankruptcy. He did not learn of the sale until the day before the new owners were to take over the house and has not seen any proceeds from the sale.

6. The issues arising in the claim of the minor DeCenzo are not issues about which it is alleged Respondent's conduct was in violation of the Code of Professional Responsibility in this case.

7. At the outset of the hearing Asst. Bar Counsel Ridgell stated it was not the Petitioner's assertion the failure of an attorney to pay a debt was a violation of the Code of Prof. Responsibility. . . .

Some of the documents he would normally have produced were unavailable because his office was "ransacked" twice, the last occasion on June 28, 2008. The so-called ransacking apparently occurred following the trustee's sale of the Ivy Bridge property. Respondent was only able to retrieve some of the materials. In addition, he claimed he had 46 file boxes of financial records, approximately 25 of which were left in a storage facility controlled by his former girlfriend, Linda Jacobs, (hereafter "Jacobs"). Respondent testified Jacobs threw the boxes in the trash, as the result of being angry with Respondent. Other than a note for a loan between Spindler and the Law Office, Respondent did not identify any specific records which were unavailable to him because of Ms. Jacobs' alleged actions.

The Law Office formed a pension plan and trust in the late 1980s. It was a defined contribution plan of which he made contributions for four years for a total of approximately $160,000. There were separate accounts within the pension plan for Respondent and his wife. All the money, however, was invested in one commingled account. The interest of any participant was a percentage based upon income. Respondent's exhibit 4 is a 2002 year-end statement showing that his wife's account consisted of $34,000 which dropped to $21,960.42 because of the loss in value of the stock market. Respondent created this document.[8]

Respondent testified that a sub-account within the Attorney Trust Account titled "Law Office" was kept to record the *de minimis* amounts of money he kept in the trust account to cover the costs of checks or nickel and dime expenses relating to the management of the account. Respondent testified that entries on the Law Office sub-account for Comcast and Verizon Wireless should have been coded to another sub-account.

8. Since Mrs. Foltz allegedly had a deferred compensation agreement with the corporation, and never actually received any income, and contributions to the pension plan were based on a percentage of income, it is unclear how contributions were made on her behalf to the pension plan.

As to the Spindler transactions, Respondent testified that Spindler is now deceased but that he had represented Spindler and other family members in a number of transactions. Sometime in 2004, Spindler and his other family members sold their business for approximately $8 million. The money was wired to Respondent's Attorney Trust Account. The funds were to be apportioned based upon the interests of the various family members. When the distribution was finally completed, approximately $200,000 was left in the Attorney Trust Account. According to Respondent the money belonged to Spindler, but that Spindler denied the balance remaining belonged to him. Respondent testified he spent a day "graphing it through" to demonstrate that it was Spindler's money. Respondent alleges that Spindler knew what Respondent was going through, and since they had been friends since childhood, had authorized Respondent to use the money as a loan. In addition, Respondent testified that Spindler said to leave the remaining "interest" in the escrow account and Respondent could borrow from it as he needed. On August 18, 2000, according to Respondent, his law office borrowed $35,000 from the Spindler funds and "possibly others" totaling $44,000 pursuant to a "line of credit agreement" that the corporation had with Spindler. All the disbursements on the Michael W. Spindler register were for Spindler except for the disbursements to Respondent for loans. Respondent testified that the sub-account was for Spindler in his individual capacity and not Respondent's account.[9]

Respondent claimed that his mind is "gone" and that he has a short term memory problem as a result of the unrelenting stress caused by the events of the last ten years. Respondent saw a psychiatrist for three years, but stopped treatment because the psychiatrist "fired" him because his life was too depressing.

Respondent further testified that the Law Office balance sheet for 2000 showed a $30,600 liability owed to Respondent and his wife as tenants-by-the-entireties for money they loaned the Law Office before the DeCenzos judgment

in August of 2000. Although Respondent did not "do a cash analysis," he thought that the $30,600 designated note payable to R & D Foltz was also probably the result of personal money he borrowed from Spindler and that there had been a note which he no longer had. The $12,157 entry designated A/P RNF & DIF was not reflected by a note so it was designated as an account payable. Respondent denied the loans were accounted for on an accrual basis and contends they were all on a cash basis. None of the interest due to Spindler was accrued on a liability basis.

With regard to the rental properties, Respondent testified that the Stafford Road rental property had been owned by he, his wife and his parents prior to sometime in 2000. In 2002, he assigned his property interest in the partnership to his parents in exchange for $20,000. The property known as Westowne was owned by he and his wife. It was operated as a partnership for profit until they transferred the real estate partnership to the pension in exchange for forgiveness of $100,000 they had borrowed.[10]

9. The Court is troubled by this unexplored and unexplained phenomenon, that after "distribution" $200,000 belonging to Spindler was left in the Attorney Trust Account, without Spindler understanding that it was his money, because the Court does not understand how a distribution occurs with funds left over. As curious, Spindler who allegedly denied the funds were his, originally, left the funds with Respondent to be used as, when, and if, Respondent saw fit to use them. The Court is not required to believe Spindler's altruism occurred or that Respondent acted properly in the handling of Spindler's funds resulting in the $200,000 remaining in the account.

Respondent testified that the sub-account titled "RNF and DIF," which meant Respondent and his wife as tenants-by-the-entirety, was to hold and disburse assets that they owned as tenants-by-the-entireties. According to Respondent, he used his Attorney Trust Account to provide a "track record" for the transactions appearing on the register and that one of the $10,000 deposits from the pension plan account to the Attorney Trust Account was attributable to his wife's account and that was why he wrote the check to the escrow/trust account. The rest of the checks deposited to the trust account were written payable to Respondent.

According to Respondent, it did not matter whether the checks were from her account because, under federal law and under pension law, he had a joint and survivorship annuity interest in the property. Therefore, the funds should not have been disbursed without both parties agreeing. He testified that he deposited the pension money to the Attorney Trust Account because they did not have a joint checking account and that he represented his wife in connection with paying the mortgage and the foreclosures on the Ivy Bridge property.

Respondent's explanation for the RNF & DIF sub-account is not consistent with the other transactions in the sub-account. Money in the sub-account came from sources other than the pension plan account. The opening balance of $7,100, on January 3, 2003, was a bookkeeping entry from the property management account which contained rents and expenses relating to Westowne and Stafford Road. The $2,000 check deposited the same day came from an account used for the rental properties. Disbursements from the second pension plan deposit were made for reasons other than mortgage payments and the sub-account was not closed out after the deposits from the pension plan. Transactions continued to be attributed to this account through December 2004.

10. Exhibit 2 is a Deed dated December 31, 2003, from Respondent and his Wife as Grantors to the Pension Plan. The Deed presented although bearing the signatures of the Grantors, does not appear to have been recorded. A review of the records of the State Department of Assessments and Taxation available on line, as of April 20, 2009, lists the property in the names of the Foltzs and makes no reference to a conveyance to any other person or entity since their purchase of the property December 26, 1985. The only fact considered in preparation of this opinion is that the exhibit is a copy of an executed, but unrecorded deed.

According to Respondent, he and his wife separated in February of 2002. He testified about her, stating his wife was a spendthrift and had a mental illness when it came to spending. Further, that she used the business credit cards for personal expenses even though Respondent warned that

the DeCenzos would allege fraud and that they should not commingle money.

Respondent testified personal expenses were not charged to the corporate books and none of the personal charges were written off by the corporations for tax purposes. Records were kept as to the amount of business related charges on the credit cards.

Respondent testified rent payments for the use of the Ivy Bridge property by the Law Office and SBAG were for years prior to the judgment. He contends he would have been justified in paying a salary to his wife because she had not been paid for years. Mrs. Foltz worked full time in the Law Office as a paralegal from 1984 until sometime in 2000 or 2001. Respondent first testified that Mrs. Foltz did not receive a salary pursuant to a plan that they had for deferred compensation, which was instituted in writing in the minutes of his corporation for him prior to the DeCenzo lawsuit. He then stated that he did not recall if there was a plan for his wife at that time and then said that there probably was not.

It is Respondent's understanding that a joint account with his wife opened after the judgment would be subject to attachment. He explained that, for this reason, money came out of his pension account and was paid directly to people to whom he owed money, as opposed to taking money out of his pension account and putting it into a joint account.

Respondent agreed with Garvey that the pension plan entitled Respondent to borrow money from the plan, but disagreed that the loan agreement had to be collateralized and in writing. After 2002, Respondent had no personal assets, but did have substantial equity in the Ivy Bridge property that he and his wife could have put up for collateral. Respondent testified that he wanted to collateralize the pension plan loan but he could not get around to doing it.

In assessing these facts, Judge Howard offered the following conclusions of law:

### *Conclusions of Law*

Petitioner alleged that Respondent misused his Attorney Trust Account in violation of Maryland Lawyers' Rules of Professional Conduct, (hereafter "MRPC"), 1.15 and Maryland Rule 16–607. The Court need not find that the Respondent's conduct was intentional to find that Respondent violated these rules prohibiting the misuse of an Attorney Trust Account. *Attorney Grievance Commission v. Boehm*, 293 Md. 476, 481, 446 A.2d 52, 54 (1982), *Attorney Grievance Commission v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997) (claimed ignorance of ethical duties and bookkeeping requirements is not a defense in disciplinary proceedings).

### A. Rule of Professional Conduct 1.15

**Rule 1.15 Safekeeping Property**

*(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation . . . .* [11]

There is clear and convincing evidence that Respondent failed to keep client and third persons' funds in his possession in connection with a representation separate from his personal funds. The clear and convincing evidence was that from May 15, 1998 through September 15, 2005, Respondent deposited client related trust funds into a law office Attorney Trust Account titled: Richard N. Foltz, III, Attorney Trust Account IOLTA. From January 2000 through December 2005, Respondent deposited and/or maintained personal funds in this same account. This conduct violated MRPC 1.15(a).

11. This is the version of Rule 1.15(a) in effect during the time of the alleged misconduct. Section (a) of Rule 1.15 was amended in

2005, however, the language concerning commingling was not changed.

The evidence demonstrated that Respondent received a loan of approximately $200,000 from Spindler in late 1999 or early 2000. The proceeds of this loan were maintained in the Attorney Trust Account from early 2000 through June 17, 2005. At various times during the span of time, Respondent disbursed portions of those funds to himself and his law office. Some of the disbursements were designated "loan." On March 21, 2000, Respondent deposited client trust funds into the Attorney Trust Account. A portion of these client funds remained in the account until January 23, 2001.

At trial, Respondent testified that Spindler was a friend since childhood as well as a client. Funds were deposited in the trust account in connection with business transactions in which Respondent represented Spindler and others. After making disbursements, there was some $200,000 left which Respondent claimed was owed to Spindler. According to Respondent, Spindler knew about the problems Respondent was experiencing and offered to lend Respondent this money. According to Respondent, Spindler told him to leave the remaining "interest" in the escrow account and borrow it as needed.

Respondent tracked the funds loaned to him by Spindler in a sub-account titled: Michael Spindler. At trial, Respondent characterized all the disbursements on the Michael Spindler register as having been disbursed on behalf of Spindler except for the disbursements to Respondent and his law office. While a small portion of the $115,000 accounted for in this sub-account may have been used for Spindler's benefit, that does not mean that the loan proceeds were client trust funds. When Spindler offered to loan Respondent money and Respondent accepted the offer, the funds were no longer client funds and should have been promptly removed from the trust account. Instead, Respondent allowed portions of the loan proceeds to remain in the trust account until 2005.

The evidence also established that, from February 2002 through December 30, 2004, Respondent deposited and disbursed funds relating to his property management business to the Attorney Trust Account. On January 31, May 3, July 30, October 8 and November 20, 2002, client funds were deposited to the Attorney Trust Account.

Respondent did not claim the funds related to his property management business to be law office "trust funds." Prior to the entry of the DeCenzos' judgment, Respondent did not use his Attorney Trust Account for his property management business. He used another and separate account named "property management." Respondent acknowledged that he did not use the Law Office trust account for the deposit of property management business funds until the DeCenzos attached the property management account.

## B. Maryland Rule 16–607

**Maryland Rule 16–607—Commingling of Funds**

*a. General Prohibition*

An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

*b. Exceptions*

*1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation pursuant to Rule 16– 710 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.*

*2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.*

*3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.*

There is clear and convincing evidence that Respondent violated Maryland Rule 16–607. This rule, unlike MRPC 1.15(a), may be violated even if there are no client funds in the attorney trust account when the personal funds are deposited. In *Attorney Grievance Commission v. Webster,* 348 Md. 662, 705 A.2d 1135 (1998), the Court of Appeals considered whether a lawyer could use an account titled as an attorney trust/escrow account for the lawyer's own business and personal purposes when the account no longer contained or was used for client trust funds. The Court held that Maryland Rule 16–607 prohibits the use of a bank account designated as an attorney trust/escrow account for personal purposes, even if it was no longer intended that the account be used for trust purposes. It is clear that, as long as the account is designated as an attorney trust/escrow account, the lawyer may not use the account for personal purposes even if there are no client funds in the account. *Webster,* 348 Md. at 677–78, 705 A.2d at 1142–43.

In *Webster,* the Court reasoned that the purpose of the anti-commingling rules is to protect client funds from the claims of creditors of the attorney and that using an account designated as an attorney trust account, when it no longer actually serves as such, constitutes a holding out to the public that the monies contained therein are not subject to attachment and improperly suggests that the monies are beyond the reach of creditors of the attorney. By depositing his personal funds into an account entitled "escrow

account" the lawyer improperly represented to his creditors that those funds were being held for a third party.

As indicated above, Respondent deposited personal funds to the Law Office trust account relating to the property management business and loans when there were client funds in the account in violation of Rule 16–607. In addition, Respondent deposited personal funds to the Attorney Trust Account from his pension plan checking account at times when there may not have been client trust funds on deposit. On or about January 14, 2003, a $10,000 check on the pension plan account was deposited to the Attorney Trust Account. On or about March 5, 2003, he deposited another $10,000 to the Attorney Trust Account from the pension plan account. Respondent also deposited personal funds to the Attorney Trust Account on April 17, 2003, when $2,000 was deposited from a source identified as "RNF." Another $1,000 from "RNF" was deposited to the Attorney Trust Account on April 23, 2003.

None of the funds described above were permitted by rule or other law to be deposited to an account designated as an Attorney Trust Account as defined by Maryland Rule 16–604, which provides:

> *Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.*

There is clear and convincing evidence that Respondent violated Maryland Rule 16–607.

C. Rule of Professional Conduct 8.4

**Rule 8.4 Misconduct**

It is professional misconduct for a lawyer to:

*(a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another; ...*

*(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;*

*(d) engage in conduct that is prejudicial to the administration of justice; ...*

There is clear and convincing evidence that Respondent engaged in conduct involving dishonesty, fraud, deceit and misrepresentation in violation of Rule 8.4(c) in order to hide assets and avoid his judgment creditor's collection efforts.

There is clear and convincing evidence that by using a bank account designated as an attorney trust account for his business and personal transactions, Respondent falsely represented that the funds in the account were being held in trust for clients or client related matters, and therefore not available to creditors, in violation of MRPC 8.4(c). *Webster,* 348 Md. at 677–78, 705 A.2d at 1142–43. This conduct occurred during a time when Respondent knew that collection efforts were ongoing and that his Attorney Trust Account would not be subject to attachment by his creditors. He had no other or personal accounts for that reason. In fact, on October 21, 2000, a Writ of Garnishment on Property was issued to the Law Office. On that day, the Law Office was holding Respondent's personal funds in its Attorney Trust Account.[12] *See Attorney Grievance Commission v. Powell,* 369 Md. 462, 475, 800 A.2d 782, 790 (2002) a lawyer who deposited earned fees and money he received from his father into a bank account designated as a trust account and then used the account for personal and business purposes in an effort to hide assets from his creditors violated MRPC 8.4(c) and (d); *Attorney Grievance Commission v. Pak,* 400 Md. 567, 929 A.2d 546 (2007) (an

attorney who undertook fraudulent actions in order to protect her parents and their assets violated MRPC 8.4(c)).

12. There is evidence that Respondent may have been using the trust account to keep money from not only the judgment creditors, but also his wife. In his statement to the Petitioner during its investigation, Respondent testified that he deposited funds from the pension plan account to the Attorney Trust Account because he did not have a joint account or a personal account and that the deposit was "joint money" since his wife had a "joint survivor annuity" interest in the funds. Respondent and his wife separated in February 2002, before the pension funds were deposited into the trust account. He further represented that when they began experiencing marital difficulties his paying rent for the use of office space reduced the funds against which she could assert a claim, if they were to be divorced at some point.

There is clear and convincing evidence that Respondent fraudulently conveyed $59,825 in 2001 and $45,195 in 2002. These were the transfers identified by Respondent on his law office and SBAG tax returns as rent payments from the corporate entities that he controlled to himself and his wife. There is clear and convincing evidence that these transfers were made with the intent to hinder, delay or defraud the DeCenzos in violation of Md.Code Ann. CL Art. § 15–207, which provides that:

> *Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.*

In *Wellcraft Marine Corp. v. Roeder*, 314 Md. 186, 189–90, 550 A.2d 377, 379 (1988), the Court of Appeals identified the nine generally recognized *indicia* of fraud:

1. Insolvency or indebtedness of the transferor;
2. Lack of consideration for the conveyance;
3. Relationship between the transferor and transferee;
4. The pendency or threat of litigation;
5. Secrecy or concealment;
6. Departure from the usual means of business;
7. Transfer of the debtor's entire estate;
8. Reservation of benefit to the transferor; and

9. Retention by the debtor of possession of the property.

Most of the *indicia* of fraud are present with regard to these transactions. First, Respondent claimed to have no income and to be insolvent during 2001 and 2002. The transferor and the transferee were for all intents and purposes the same, or so closely related to effectively be considered to be the same, and the actor responsible for the conduct of the transferor and the transferee in each transaction was Respondent. Respondent was merely transferring money he held in the names of the corporations to himself and his wife, the shareholders of the corporations. Respondent, the debtor, retained possession of the property transferred.

In addition, there was no consideration for the payments called "rent" since they were not actually rent payments as Respondent represented to the IRS and the DeCenzos' counsel. In fact, the payments called "rent" appear to have been so called as a pretense to cover the transfer of tens of thousands of dollars from the corporate entities controlled by Respondent to Respondent and his wife in 2001 and 2002, while Respondent claimed no income from these businesses.

Respondent produced a lease agreement, dated February 1, 1989, between he and his wife and the Law Office. The amounts and timing of the purported rent payments were not, however, consistent with the terms of this lease. The lease called for a monthly payment of $2,000 due in 12 consecutive, equal monthly installments, in advance, on the first day of each month. The transfers were for the most part greatly in excess of $2,000 per month and not in equal installments.

It was also clear that the large lump sum rent payments to Respondent and his wife did not start until after the judgment was entered in 2000. During prior years, despite the fact that the corporation had sufficient income to do so, the Law Office paid no rent from 1991 through 2000, except for a $5,000 payment in 1993. The SBAG made rent payments in 1991 of $3,500, in 1992 of $1,500 and in 1994 of $12,000, although there was no legal reason for it to have

done so. There were no rent payments from it between 1995 and 2001 save for a $200 payment in 2000. Regardless of whether such payments were a violation of the Maryland Uniform Fraudulent Conveyance Act, as apparently found by Judge Levitz, they are a clear violation of MRPC 8.4(c).

Respondent also engaged in conduct involving dishonesty, fraud, deceit and misrepresentation in connection with the use of the pension plan checking account. The evidence demonstrated that Respondent used this account, not in accordance with the terms of his pension plan, but rather, as a personal account to pay utility and mortgage expenses for his investment property, the jointly titled Ivy Bridge property and to provide himself with cash. The transfers from the pension plan bank account to the Attorney Trust Account and payment of both the property management business expenses and the mortgage on the Ivy Bridge property were transfers between related entities without consideration and were, therefore, fraudulent conveyances.

Respondent claimed the Westowne mortgage and utilities were paid from the pension account because the pension plan owned the property after he and his wife transferred ownership on December 31, 2003. The evidence does not, however, support Respondent's testimony. Although a deed admitted into evidence by Respondent indicated that Respondent and his wife, individually, transferred the property from themselves to the pension plan on December 31, 2003. However, Respondent did not begin using the pension plan bank account for transactions related to Westowne until a year after the transfer. Instead, he continued to use his Attorney Trust Account for the deposit and disbursement of rent and expenses for Westowne for a year after the purported transfer.[13] In an effort to explain this apparent inconsistency, Respondent testified that he did not get around to telling Rusterholtz to make the change for a year or so.

Furthermore, from August 2003 until February 16, 2006, the pension plan account was also used to pay more than

$70,000 on the Ivy Bridge mortgage, a property which was not owned by the pension plan.

In addition to disbursements for the Ivy Bridge and Westowne properties, Respondent also disbursed funds from the pension plan checking account to himself, his law office, his attorney trust/escrow account, Baltimore Gas & Electric, Home Depot, Sam's Club, Director of Finance, a plumbing company, and a doctor. Garvey testified that it is inappropriate to make these types of disbursements from a pension plan, and even if the plan owned Westowne, the disbursements were not in accordance with the provisions of the pension plan agreement. The pension plan allowed Respondent to withdraw cash only under certain circumstances: pension benefits or a loan.

13. Respondent testified that the property was owned by a partnership. The grantors on the Deed dated December 31, 2003 are Respondent and his wife, not a partnership. See also Footnote 10 above.

However, the disbursements from the pension plan checking account were consistent with neither circumstance. The pension plan provided that loans must be documented in writing, must be repaid within 5 years, must be collateralized with up to 125% of the borrowed amount and bear interest. Respondent admitted that these disbursements were not in compliance with the terms of the pension plan agreement.

There is clear and convincing evidence, from 2001 to 2006, Respondent used the pension plan account as a personal bank account because he knew an account titled in this manner would not be subject to creditors and that the disbursements from the pension plan account were not loans. These disbursements were, in fact, transfers made with the purpose of hiding assets and defrauding creditors and therefore in violation of MRPC 8.4(c).

There is clear and convincing evidence that Respondent used bank accounts titled in the names of his law office and the SBAG to pay personal and family expenses. Garvey, Respondent, and Rusterholtz all testified that corporate credit cards were used for non-business related transactions

after 2000. Respondent and Rusterholtz kept careful track of which transactions on the billing statements were related to the corporations and which were personal and, at trial, Respondent reiterated that no personal expenses were written off by the corporate entities for tax purposes. The fact remains, however, that the corporate accounts were used to pay for personal expenses. As Garvey pointed out, using the corporate funds for personal expenses enabled Respondent to claim he had no income and no personal assets. Such conduct was dishonest, fraudulent, deceitful and a misrepresentation in violation of MRPC 8.4(c).

A lawyer engages in conduct prejudicial to the administration of justice when he or she engages in conduct likely to bring the legal profession into disrepute. *Attorney Grievance Commission v. Childress,* 360 Md. 373, 381–82, 758 A.2d 117, 121 (2000). The dishonest and fraudulent conduct described above is the type of conduct likely to bring the profession into disrepute and violated MRPC 8.4(d).

By violating MRPC 1.15 and 8.4(c) and (d), Respondent also violated MRPC 8.4(a).

Respondent is accountable for violating the Lawyers' Rules of Professional Conduct even if the acts in which he was engaged are viewed to have been while he was acting individually, as a party litigant or property manager, when the misconduct occurred.

> "The professional ethical obligations of an attorney, as long as he remains a member of the bar, are not affected by a decision to pursue his livelihood by practicing law, entering the business world, becoming a public servant, or embarking upon any other endeavor." *Md. State Bar Assoc. v. Agnew,* 271 Md. 543, 550, 318 A.2d 811 (1974), *Attorney Grievance Commission v. Alison,* 317 Md. 523, 540, 565 A.2d 660, 668 (1989), citing *In Re Segall,* 117 Ill.2d 1, 109 Ill.Dec. 149, 509 N.E.2d 988, 990 (1987).

(Italics in original).

As Judge Howard noted, Petitioner filed Proposed Findings of Fact and Conclusions of Law by March 31, 2009, and

Respondent was to file his within fifteen days thereafter. Respondent, however, "[a]pparently not considering the directions of the court as mandatory," filed his response on April 20, 2009. Judge Howard reviewed the submission despite its lateness, concluding that the response did not alter any of his Findings of Fact and Conclusions of Law:

Respondent asserts four primary defenses to the allegations against him: (1) The allegations against him in the underlying actions out of which judgments arose were at best unwarranted; (2) The use of his various accounts was lawful and within the requirements of the Code of Professional Responsibility; (3) His actions did not violate the requirements of the laws governing the filing or payment of taxes to the Federal Government; and (4) The Proposed Findings of Fact and Conclusions of Law filed by Petitioner are not supported by clear and convincing evidence.

This Court fails to find any merit in Respondent's position.

## I. Standard of Review

As we recently stated in *Attorney Grievance v. Garcia,* 410 Md. 507, 979 A.2d 146, (2009), the standard of review in attorney grievance matters is as follows:

In attorney discipline proceedings, this Court has original and complete jurisdiction and conducts an independent review of the record. *Attorney Grievance v. McClain,* 406 Md. 1, 17, 956 A.2d 135, 144 (2008); *Attorney Grievance v. Whitehead,* 405 Md. 240, 253, 950 A.2d 798, 806 (2008); *Attorney Grievance v. Zuckerman,* 403 Md. 695, 709, 944 A.2d 525, 534 (2008); *Attorney Grievance v. Nussbaum,* 401 Md. 612, 632, 934 A.2d 1, 12 (2007); *Attorney Grievance v. Lawson,* 401 Md. 536, 571–72, 933 A.2d 842, 863 (2007). We review the hearing judge's conclusions of law de novo. Rule 16–759(b)(1); *McClain,* 406 Md. at 17, 956 A.2d at 144; *Whitehead,* 405 Md. at 253, 950 A.2d at 806; *Attorney Grievance v. Kreamer,* 404 Md. 282, 292, 946 A.2d 500, 506 (2008); *Attorney Grievance v. Parsons,* 404 Md. 175, 184, 946 A.2d 437, 443 (2008). In our review of the record, the

hearing judge's findings of fact generally will be accepted unless they are clearly erroneous. Rule 16–579(b)(2); *Whitehead,* 405 Md. at 253, 950 A.2d at 806; *Attorney Grievance v. Harris,* 403 Md. 142, 155–56, 939 A.2d 732, 740 (2008); *Nussbaum,* 401 Md. at 632, 934 A.2d at 12; *Attorney Grievance v. Siskind,* 401 Md. 41, 54, 930 A.2d 328, 335 (2007); *Attorney Grievance v. Mininsohn,* 380 Md. 536, 564, 846 A.2d 353, 370 (2004).

(Footnotes omitted).

## II. Introduction

In the present case, the hearing judge concluded that Respondent violated MRPC 1.15 and 8.4(a), (c), and (d), as well as Rule 16–607. Although Bar Counsel filed no exceptions, Respondent took numerous exceptions, asserting generally that he properly deposited, withdrew, and maintained certain monies in his attorney trust and pension plan accounts, and any findings to the contrary were without merit.

 In addressing Respondent's exceptions as well as to understand the issues, we recognize from the outset that attorney escrow and pension accounts share an important similarity, in that both are afforded significant creditor protections. As we noted in *Attorney Grievance v. Taylor,* 405 Md. 697, 716, 955 A.2d 755, 766 (2008), citing *Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 677, 705 A.2d 1135, 1142 (1998), funds placed in an attorney escrow account are beyond the reach of the creditors of the attorney; such accounts essentially serve as "sanctuary for client funds from the attorney's creditors." *Attorney Grievance v. Sheridan,* 357 Md. 1, 31, 741 A.2d 1143, 1159 (1999).

Pension funds are also afforded statutory protection from creditors. Subject to certain exceptions, Section 206(d)(1) of the Employee Retirement Income Act (ERISA), 29 U.S.C. § 1056(d)(1), exempts pension plans from execution by creditors. Also, Section 11–504(h)(1) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.Vol.), shields from collection "any money or other assets payable to

a participant or beneficiary from, or any interest of any participant or beneficiary in, a [qualified] retirement plan...." *See also Prince George's County Police Pension Plan v. Burke,* 321 Md. 699, 703, 584 A.2d 702, 704 (1991) (noting pension plans falling under the auspices of certain sections of the Internal Revenue Code are exempt from all claims of creditors with few exceptions).

### A. Respondent's Exceptions to Findings of Fact

Mr. Foltz first excepts to the hearing judge's finding that he "appears to have made all decisions of substance relating to the operation" of his law office and Small Business Advisory Group. In excepting, Mr. Foltz acknowledges that his former spouse had "insignificant" involvement in the operation of the corporations. He then asserts, however, that despite his former wife's limited involvement, he did not make all of the financial decisions regarding check payments or credit card purchases: [7]

> To the contrary, the uncontested evidence was that the personal charges on the business credit card were made by my wife, contrary to expressed instructions not to use the business credit card for personal expenses. Also, my book-keeper often determined how much would be paid on each bill.

Mr. Foltz's contention is without merit. The testimony of the forensic accounting expert, Robert A. Garvey, demonstrates clearly and convincingly that Mr. Foltz maintained the check registers as well as all other records for both his law office and Small Business Advisory Group accounts. Assuming as Mr. Foltz asserts, all personal charges on the business credit card were made by his wife, he, nonetheless, failed to reimburse the law office and Small Business Advisory Group accounts for personal charges, as Mr. Garvey further testified. Finally, although Ms. Rusterholtz, Respondent's bookkeeper, testified that she would often prepare checks to pay bills, she

---

7. All of Mr. Foltz's references to transcripts and exhibits have been omitted.

admitted that she was not authorized to sign checks, and that Mr. Foltz reviewed and signed the checks. Thus, we overrule this exception.

Mr. Foltz next takes exception to the hearing judge's factual finding that Andrew D. Freeman, counsel for the DeCenzos, testified that "Respondent never manifested an interest in amicably satisfying the claim." Mr. Foltz asserts that it "is not unethical to not settle a civil judgment," and that the "purpose of the finding of fact is merely to paint [him] as uncooperative." Mr. Freeman testified as follows:

[Bar Counsel]: Was Mr. Foltz approached about voluntarily paying the judgment?

[Mr. Freeman]: Yes.

[Bar Counsel]: And what was the result of that?

[Mr. Freeman]: He never, we discussed at various points over the years after 2000 trying to settle it and he said he was never interested in that.

Mr. Freeman further testified that from August 2000 to February 2007, "Mr. Foltz never paid a penny voluntarily towards the judgment." Judge Howard's finding is supported by clear and convincing evidence, and Mr. Foltz's exception is overruled; Mr. Foltz's supposition as to relevance is unavailing.

Respondent also excepts to the hearing judge's findings summarizing repeated discovery and collection efforts made by the DeCenzos' counsel, Mr. Freeman, from the entry of judgment on their counterclaim in 2000 to the filing of the fraudulent conveyance action in 2005. Mr. Foltz appears to argue that he made full disclosure of his assets during the collection efforts undertaken by the DeCenzos. Judge Howard did find that the DeCenzos' collection efforts resulted in the "identification and sale of assets, including a car, a gun collection and an investment property," yielding recoveries of approximately $55,000. The record, however, encompassing not only the testimony of Mr. Freeman, but also the documentary analyses by Mr. Garvey and Mr. DeBone also reflects that Mr. Foltz consistently avoided collection efforts during

2000 to 2005. Judge Howard also concluded, based upon exhibits in the record, as well as Mr. Freeman's testimony, that Mr. Foltz failed to produce corporate tax returns for his law office and the Small Business Advisory Group until after the commencement of the fraudulent conveyance suit. As a result, we overrule Mr. Foltz's exception to the findings regarding his recalcitrance in discovery of his assets prior to the filing of the fraudulent conveyance action in 2005.

Mr. Foltz further takes exception to the hearing judge's finding that on several occasions after August 2000, "Writs of Garnishment were served on both the Law Office and SBAG for money owed by those entities to Respondent." Mr. Foltz asserts:

> On October 31, 2000 a Request for a Writ of Garnishment of Property was filed against my professional corporation. It was never served. On June 1, 2001 a Request for a Writ of Garnishment of Wages against my professional corporation was filed. It was also not served. I happen [sic] to discover these two filings by reviewing the court docket and filed an answer. On August 29, 2002 a request for writ of garnishment of wages was filed against SBAG. It was served and answered. However, a Request for a Writ of Garnishment of Property against SBAG also filed on August 29, 2002 was not served. At no time did opposing counsel file a request for default or contest my answer. No garnishment order ever issued.

Mr. Foltz acknowledges that he answered writs of garnishment of property and wages filed against his law office, so that he had notice, satisfying process requirements and that he was served with, and answered, a writ of garnishment of wages filed against his Small Business Advisory Group. The finding is supported by clear and convincing evidence, and we overrule the exception.

Respondent next excepts to the hearing judge's finding regarding the DeCenzos' motion to hold Mr. Foltz in contempt, and the subsequent issuance of a body attachment. Respondent asserts:

[T]he official docket admitted into evidence shows that opposing counsel's November 16, 2001 Motion to Compel Discovery Responses to my professional corporation was in fact answered on December 4, 2001. Opposing counsel filed a reply to my answer on December 18, 2001. The fact that my corporation's answer was timely filed, but the Court still issued a body attachment, and then set a $50,000 bail amount for an attorney in good standing is evidence of a continuing pattern of judicial abuse based upon hatred because I am an accused child molester. Also note that the docket specifically reflects bail to be determined by the commissioner; yet, the commission refused to set bail so I was required to sit in jail over the weekend until I had a hearing before a circuit court judge.

Respondent seems to argue that he properly responded to the discovery motion, but that the Baltimore County Circuit Court judge erred in issuing a body attachment resulting in Respondent being taken into custody. Docket entries, however, demonstrate by clear and convincing evidence, that the Writ of Body Attachment was issued on February 5, 2002, after Respondent failed to appear on January 11, 2002, for trial on the contempt motion, rather than for failure to respond to discovery requests. The exception is overruled.

Finally, Mr. Foltz takes exception to the hearing judge's findings regarding discovery efforts by the DeCenzos' counsel in the fraudulent conveyance action, in that Judge Howard found that Respondent "provided one joint personal income tax return for the year 2004, and the tax returns for the Law Office and SBAG for 1990 through 2004," but that he refused to sign a waiver for the DeCenzos to obtain his personal returns directly from the IRS. Mr. Foltz asserts that during that period,

I had no reportable income and was not required to file a tax return. In fact, during that period of time I had substantial loss carry forwards from my professional corporation. My wife, from whom I was separated, testified that she filed joint income tax returns and signed my name. I have never received copies.

> No copies of the subject income tax returns were ever in my possession or under my control. Once again, the circuit court just wants to "paint" me as being uncooperative and insinuate that I filed fraudulent discovery answers and that I am hiding tax returns to conceal assets and income. However, even know [sic] I was not required to file personal income tax returns, I did in fact produce all of my corporate income statements, balance sheets, bank records, and check records for both corporations reflecting that I had no personal income.

In so alleging, Respondent fails to elucidate how the hearing judge's findings are in error. Mr. Freeman testified that in 2005, Mr. Foltz produced business tax returns through 2004, as well as one personal income tax return for 2004. Mr. Foltz, moreover, conceded on cross-examination during the evidentiary hearing that he was asked to produce certain tax returns, that he did not do so, and that he refused to sign a waiver permitting opposing counsel to obtain the requested returns from the IRS. As a result, we overrule the exception.

We have reviewed Judge Howard's remaining findings of fact and conclude that they are supported by clear and convincing evidence.

### B. Respondent's Exceptions to Conclusions of Law

#### 1. MRPC 1.15

Respondent takes two exceptions relating to the hearing judge's conclusion that he violated MRPC 1.15(a), which requires a lawyer to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." Mr. Foltz asserts that the hearing judged erred in concluding that proceeds of a $200,000 loan from Michael W. Spindler were improperly maintained in the attorney trust account from early 2000 through June 17, 2005, in violation of MRPC 1.15(a):

> To the contrary, the monies in his account belonged to Michael Spindler. The monies that I barred [sic] out or

pursuant to an agreement between myself and Mr. Spindler that I could borrow money's account [sic] of the account on an as needed basis. However, at any time Mr. Spindler could have requested a disbursement of all the funds in the account, because the monies were his monies.

The hearing judge concluded, "[w]hen Spindler offered to loan Respondent money and Respondent accepted the offer, the funds were no longer client funds and should have been promptly removed from the trust account." We agree.

In *Attorney Grievance v. Snyder*, 368 Md. 242, 254–55, 260, 793 A.2d 515, 522, 525–26 (2002), we determined that a lawyer violated MRPC 1.15(a) when he took funds from his personal credit cards and line of credit advances, essentially loans, and deposited the funds into his client escrow account during his involuntary bankruptcy proceeding. We concluded that Mr. Snyder "used the client escrow account as a repository for the personal assets he sought to conceal from his creditors...." *Id.* at 260, 793 A.2d at 526. In the present case, Mr. Foltz similarly maintained the Spindler loan or line of credit in his trust account to conceal such funds from the DeCenzos, in violation of MRPC 1.15(a).

Next, Mr. Foltz takes exception to the hearing judge's ruling that from February 2002 through December 2004, Respondent "deposited and disbursed funds relating to his property management business" to his escrow account. Mr. Foltz asserts:

I managed two rental properties known as "Stafford" and "Westowne."

The Stafford property was originally operated as a partnership between my wife and me, and my parents. In January of 2002, my wife and I sold our partnership interest to my parents. From January 2002, the Stafford property was managed by me for the benefit of my parents.

\* \* \*

On December 31, 2003 my wife and I sold our interest in the Westowne property to The Law Offices of Richard N.

Foltz, III Chartered Defined Benefit Plan, in exchange for forgiveness of monies borrowed from the pension plan.

I was a vested beneficiary of the pension plan. My wife was also a vested beneficiary of the pension plan. In addition, as husband and wife, my wife and I had a joint and survivorship annuitant interest in the other's pension account benefits.

My Wife and I, who were separated at all times material to these proceedings, either as co-owners, co-partners, or joint and survivor annuitants, had separate claims to all of the funds in this property Management sub-account. Accordingly, it was not only proper, but mandated that the rent monies I collected in my capacity of managing these properties be deposited into the escrow account.

In excepting, Respondent relies on MRPC 1.15(e), which presently provides that "[w]hen a lawyer in the course of representing a client is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved." Mr. Foltz asserts that MRPC 1.15(e) mandates that he deposit rents collected in connection with his property management business in his escrow account, because he, his parents, and his wife, allegedly had an interest in the funds, and that he apparently represented himself, his former spouse, or his parents with respect to the rent proceeds. Not only was MRPC 1.15(e) not in effect at the time of the events in question, but Mr. Foltz's contention is unavailing because 1.15(e) shelters only monies received "in the course of representing a client," over which there was a dispute, neither of which existed. Rather, the conclusion of Judge Howard is buttressed by Respondent's acknowledgment that he did not use his escrow account to deposit rent payments until the DeCenzos attached a separate property management account, yielding the conclusion that it was more than mere coincidence that the Respondent allegedly began representing himself, his wife, and his parents with regard to the "disputed" rental payments. Judge Howard did not accept Mr. Foltz's tortured

assertions regarding the deposit of the rental payments in the trust account, and neither do we.

### 2. Rule 16–607

■ Respondent next takes exception to the hearing judge's conclusion that he violated Rule 16–607, which provides that "[a]n attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account. . . ." In what he has termed exceptions to the conclusions of law, he really appears to initially challenge the factual finding underpinning Judge Howard's legal conclusion, asserting that the hearing judge erred in ruling that he deposited two $10,000 checks from his pension plan account, as well as checks totaling $3,000 from a source identified as "RNF," to his escrow account, in violation of Rule 16–607.

First, the record clearly and convincingly indicates that on January 14, 2003, and March 5, 2003, Mr. Foltz made $10,000 deposits to his escrow account from his pension account. Mr. Foltz contends that the two $10,000 deposits "belonged to [his] wife as a vested employee," and that he had "a joint and survivor annuity interest therein." He continues that he could not have violated Rule 16–607, because Rule 1.15(e) mandated that he deposit the funds in his escrow account "to be dispersed as indicated for joint debts and obligations." As we noted above, Respondent's reliance on MRPC 1.15(e) is misplaced, because that provision pertains only to funds which come into an attorney's possession "in the course of representing a client," and over which a dispute exists. Rather, Mr. Foltz violated Rule 16–607 by improperly depositing personal pension funds into his attorney trust account.

Mr. Foltz also argues that "there was no evidence indicating" that $1,000 and $2,000 checks "came from [his] pension plan," but the hearing judge only found that the $3,000 deposited in the trust account were personal funds. This finding that the funds were personal is clearly supported in the record, and we agree with Judge Howard that Mr. Foltz violated Rule 16–607 when he deposited personal funds in his escrow account. *See Attorney Grievance v. West,* 411 Md. 3,

981 A.2d 621 (2009) (concluding an attorney violated Rule 16–607 when he deposited "numerous checks written on personal accounts to the attorney trust account thereby commingling those funds").

### 3. MRPC 8.4

█ Respondent takes several exceptions to Judge Howard's conclusion that he violated MRPC 8.4(c), which provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . ." First of all, Mr. Foltz takes exception to the conclusion that by "using a bank account designated as an attorney trust account for his business and personal transactions, Respondent falsely represented that the funds in the account were being held in trust for clients or client related matters, and therefore not available to creditors, in violation of MRPC 8.4(c)." Respondent replies that "all of the funds in [his] client escrow account were being held in trust for clients or client related matters." The hearing judge determined, and we agree, that the Spindler loan, rental monies from the property management business, and pension fund deposits, were unrelated to client matters. In *Attorney Grievance v. Powell*, 369 Md. 462, 474–75, 800 A.2d 782, 789–90 (2002), upon which the hearing judge relied, we concluded that an attorney violated MRPC 8.4(c) when he deposited earned fees and monies received from his father into his trust account, in an effort to hide assets from creditors. Mr. Foltz contends that *Powell* is distinguishable, because the funds were not "personal, individual assets, subject to attachment." We disagree; as Judge Howard emphasized, the loan proceeds, rental payments, and pension funds were personal assets, unrelated to client matters, that were improperly deposited and maintained in the escrow account. Therefore, we overrule this exception.

█ Respondent next challenges Judge Howard's conclusion that he violated MRPC 8.4(c) when he "fraudulently conveyed $59,825 in 2001 and $45,195 in 2002," from his corporations to himself and his wife, characterizing the distributions as rent payments. Mr. Foltz asserts that pursuant to

a 1989 lease agreement, he and his wife were entitled to rent, and therefore the distributions were not fraudulent. The hearing judge, relying on *Wellcraft Marine Corp. v. Roeder*, 314 Md. 186, 189–90, 550 A.2d 377, 379 (1988), which discusses various indicia of fraud, concluded that because the payments greatly exceeded the monthly rent due under the lease, were made in years in which Mr. Foltz claimed no income from his corporations, and did not commence until after the DeCenzos began collection efforts, the purported rent was a ruse to transfer tens of thousands of dollars from the corporations to Mr. Foltz and his wife, without generating income subject to garnishment.[7] We agree.

In *Attorney Grievance v. Pak*, 400 Md. 567, 591, 929 A.2d 546, 560 (2007), we considered badges of fraud in the context of an attorney grievance matter, informing our analysis under MRPC 8.4(c), including: the insolvency or indebtedness of the transferor; lack of consideration for the conveyance; relationship between the transferor and transferee; dependency or threat of litigation; secrecy or concealment; departure from the usual method of business; the transfer of the debtor's entire estate; the reservation of benefit to the transferor; and the retention by the debtor of possession of the property. As the hearing judge noted, most of the indicia of fraud are present in the purported rent transactions. Mr. Foltz transferred over $100,000 to himself and his wife in 2001 and 2002, while claiming no income from his law office and Small Business Advisory Group. Mr. Foltz conveyed the funds held in the names of his corporations to himself and his wife, the corporate shareholders, suggesting that the transferor and transferee, as Judge Howard noted, were "so closely related" to effectively be considered the same. The lump sum pay-

---

7. Mr. Foltz initially asserts the hearing court erred in its determination that the payment of rent "was a violation of the Fraudulent Conveyance Act," and cites precedent interpreting the statute. This argument is without merit, however, because the hearing judge was explicit in stating, "[r]egardless of whether such payments were a violation of the Maryland Uniform Fraudulent Conveyance Act … they are a clear violation of MRPC 8.4(c)."

ments, which greatly exceeded the $2,000 monthly rent, coincided with the DeCenzos' collection efforts, and the payments were not made on or near the first of the month, as the lease provided. We conclude, therefore, that disguising such disbursements as rent enabled Respondent to claim he received no income from his corporations, thereby defrauding the DeCenzos in violation of MRPC 8.4(c). *See Attorney Grievance v. Byrd*, 408 Md. 449, 483, 970 A.2d 870, 889 (2009) (reasoning that an attorney violated MRPC 8.4(c) when he under-reported his income in an involuntary bankruptcy proceeding by filing false business reports).

Respondent takes two additional related exceptions to Judge Howard's conclusion that he violated MRPC 8.4(c) in connection with the use of his pension plan checking account. Mr. Foltz initially asserts that he was entitled to pay his personal debts with funds from his pension account, because the pension funds themselves were exempt from attachment by the DeCenzos.[8]

Mr. Foltz clearly utilized the pension account as a personal account, writing checks to himself, his law office, his trust account, "Citi Mortgage," "Midland Mortgage," "BGE," "Home Depot," and "Sam's Club." Such disbursements were not in accordance with the pension plan agreement that governed its use and, thereby, its validity. As Mr. Garvey testified, the pension plan agreement permitted withdrawals, only under certain circumstances, namely (1) the payment of pension benefits, or (2) a loan, which would require written documentation, repayment within 5 years, collateral up to 125% of the borrowed amount, and the payment of interest. The disbursements in this case, as Mr. Garvey testified, were consistent with neither circumstance. We agree with Judge Howard that Respondent employed his pension account in such a manner to evade his obligations to the DeCenzos, in violation of MRPC 8.4(c).

---

8. Mr. Foltz mistakenly contends that the hearing judge "appl[ied] the fraudulent conveyance statute to transfers from [his] pension plan...." The hearing judge, however, made no such reference.

Mr. Foltz further argues, however, that, "[t]here would be no logical reason for me to use my pension account as a personal bank account to somehow fraudulently keep pension assets from attachment by my creditors, because the pension assets are already exempt from attachment as a matter of law." What Mr. Foltz fails to acknowledge is that he violated the terms of his pension plan agreement by paying personal expenses from that account, thereby compromising its integrity; he also fails to appreciate that had he transferred any of the pension funds, in a legitimate fashion, to a personal checking account to pay his bills, such funds would have been susceptible to collection efforts. *See United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 57 (2d. Cir.2003) ("Only once the proceeds of the pension plan have been released to the beneficiary's hands, can creditors and others pursue claims against the funds and the funds' owner(s).").
This is the "logical reason" Mr. Foltz paid for personal expenses from his pension account. As a result, Mr. Foltz was acting "with the purpose of hiding assets and defrauding creditors," as Judge Howard concluded, in violation of MRPC 8.4(c). *See Snyder*, 368 Md. at 260, 793 A.2d at 525–26 (concluding an attorney violated MRPC 8.4(c) when he wrote checks from his escrow account for his own personal purposes during his bankruptcy litigation).

■ Respondent next takes exception to the hearing court's conclusion that he used corporate bank accounts and credit cards to pay for personal and family expenses, enabling Respondent to "claim he had no income and no personal assets," in violation of MRPC 8.4(c). Mr. Foltz argues that these charges were "de minimis," especially given that the "[c]orporations were operated out of the Respondent's home, where the potential for abuse and payment of personal expenses is great." Whether the charges were "de minimis" as Respondent suggests is of no moment; the hearing judge concluded, and we agree, that such conduct enabled the scheme to thwart the DeCenzos' collection efforts, in violation of MRPC 8.4(c). *See Powell*, 369 Md. at 470, 800 A.2d at 786 (concluding an attorney engaged in deceptive and dishonest conduct in viola-

tion of MRPC 8.4(c) when he attempted to conceal assets from creditors).

> Finally, Mr. Foltz asserts generally that the hearing judge was laboring under the misunderstanding that I had a duty to arrange my finances in such a way as to maximize payments to the DeCenzos in preference to not only other personal creditors, but also in preference to corporate creditors, and that it was fraudulent for me to make rent payments from my corporations, pursuant to a long standing written lease agreement, or to borrow money from my friends or pension, or to not somehow coerce my wife to liquidate tenants by the entireties real estate, and to use these funds to pay other creditors, or to support my children, to the exclusion of the DeCenzos.

The issue, however, was not how Mr. Foltz arranged his finances in preference to other creditors, but how he manipulated his corporate operations, his attorney escrow account, and his pension plan account to systematically *avoid* the DeCenzos' collection efforts. After the entry of judgment, he refused to respond to discovery requests for financial information, ultimately resulting in contempt proceedings for which he failed to appear and the issuance of a body attachment. The timing of rent payments from the law office account and Small Business Advisory Group to Mr. and Mrs. Foltz also coincidentally aligned with the initiation of collection efforts, when, in years prior to collection efforts, no rental payments had been made. Mr. Foltz also devised an elaborate system of sub-accounts within his escrow account, including a sub-account containing loan proceeds from Mr. Spindler, as well as a property management sub-account, containing rent payments from Mr. Foltz's investment properties; all of which unrelated to client matters and all of which inappropriate to a trust account. From 2001 to 2006, Mr. Foltz improperly paid personal expenses totaling $171,093 from his pension account in order to avoid attachment of the account by the DeCenzos. Mr. Foltz acted dishonestly, and such "[d]ishonest acts, in and of themselves are violative of Rule 8.4(c)." *Attorney Grievance v. Gisriel*, 409 Md. 331, 383, 974 A.2d 331, 361 (2009).

Judge Howard also found that the totality of Mr. Foltz's actions, including his commingling of personal and client funds, his maintenance of the Spindler and property managements monies in his attorney trust account, his fraudulent conveyances of purported rent payments, his use of his pension account for the payment of personal expenses, and his use of corporate accounts for non-business related transactions, represented conduct "prejudicial to the administration of justice" in violation of MRPC 8.4(d). We have found violations of MRPC 8.4(d) when a lawyer commingled personal and client funds in a trust account, *Attorney Grievance v. Zuckerman*, 386 Md. 341, 374–75, 872 A.2d 693, 713 (2005), and when an attorney attempted to conceal personal assets from creditors, *Snyder*, 368 Md. at 261, 793 A.2d at 526. Mr. Foltz clearly engaged in a pattern of behavior designed to conceal assets from attachment by the DeCenzos, conduct prejudicial to the administration of justice, and in violation of Rule 8.4(d).

Finally, Mr. Foltz's violations of Rules 1.15, 16–607, and 8.4(c) and (d) also constitute violations of 8.4(a), which provides that "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the Maryland Lawyer's Rules of Professional Conduct...." *See Attorney Grievance v. Webster*, 402 Md. 448, 468, 937 A.2d 161, 172 (2007) ("Because we have concluded that Respondent has violated various Rules of Professional Conduct, we overrule Respondent's exception that he violated MRPC 8.4(a), which finds professional misconduct where a lawyer 'violates or attempts to violate the Rules of Professional Conduct.' "), quoting *Attorney Grievance v. Cherry–Mahoi*, 388 Md. 124, 159, 879 A.2d 58, 80 (2005); *Attorney Grievance v. Gallagher*, 371 Md. 673, 710–11, 810 A.2d 996, 1018 (2002) ("As we have held that respondent has violated several Rules of Professional Conduct, he necessarily violated MRPC 8.4(a) as well, which finds professional misconduct where a lawyer 'violate[s] or attempt[s] to violate the Rules of Professional Conduct.' ") (alterations in original).

### III. Sanction

We must now consider the appropriate sanction for Mr. Foltz's violations of Rules 1.15, 16–607, and 8.4. Bar Counsel

recommends disbarment, while Mr. Foltz suggests no sanction, asserting that he did nothing wrong.

We evaluate every attorney grievance matter on its own merits, taking into account the facts and circumstances involved. *See Attorney Grievance v. Blum,* 373 Md. 275, 303, 818 A.2d 219, 236 (2003); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 300, 614 A.2d 102, 114 (1992). The goal of attorney discipline is protection of the public, rather than the punishment of the erring attorney. *Attorney Grievance v. Goff,* 399 Md. 1, 30–31, 922 A.2d 554, 571 (2007); *Attorney Grievance v. Mba–Jonas,* 397 Md. 690, 703, 919 A.2d 669, 677 (2007); *Attorney Grievance v. Rees,* 396 Md. 248, 254, 913 A.2d 68, 72 (2006); *Attorney Grievance v. Kreamer,* 387 Md. 503, 533–34, 876 A.2d 79, 97 (2005). Imposing sanctions that are commensurate with the nature and gravity of the violations and the intent with which they were committed is consistent with, and in fact furthers, the purpose of protection of the public, *Goff,* 399 Md. at 30–31, 922 A.2d at 571; *Attorney Grievance v. Stein,* 373 Md. 531, 537, 819 A.2d 372, 375 (2003), in that such sanctions protect the integrity of the legal profession, *Attorney Grievance v. Cassidy,* 362 Md. 689, 698, 766 A.2d 632, 637 (2001), as well as advance the public's confidence in the legal profession, *Attorney Grievance v. Christopher,* 383 Md. 624, 639, 861 A.2d 692, 701 (2004); *Stein,* 373 Md. at 537, 819 A.2d at 375; *Powell,* 369 Md. at 474, 800 A.2d at 789.

We have determined that Mr. Foltz violated Rules 1. 15, 16–607, and 8.4(a), (c), and (d). Although the gravamen of the misconduct in the present case rests on the Rule 8.4 violations, for which disbarment usually is the sanction, it is clear that the additional violations of 1.15 and 16–607 aggravate the situation. *See Snyder,* 368 Md. at 260, 276, 793 A.2d at 525–26, 535 (ordering disbarment when an attorney violated MRPC 1.15 and 8.4(c) and (d), as well as the precursor to Rule 16–607, by depositing funds from his personal credit cards and line of credit advances into his escrow account to conceal such

assets from his creditors during the pendency of his involuntary bankruptcy).

Mr. Foltz's 8.4(a), (c), and (d) violations, in and of themselves, support a sanction of disbarment. In *Attorney Grievance v. Vanderlinde*, 364 Md. 376, 414, 418, 773 A.2d 463, 485, 488 (2001), we determined that when an attorney engages in dishonest or fraudulent conduct as proscribed in MRPC 8.4(c), we do not discuss "degrees" of dishonesty, but generally order disbarment, absent compelling extenuating circumstances. We explained in that case that disbarment represents the default sanction because dishonest conduct by a lawyer is beyond excuse:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

> Disbarment ordinarily should be the sanction for intentional dishonest conduct.

*Id.* We have previously ordered disbarment when an attorney acted to thwart collection efforts by creditors. In *Pak*, 400 Md. at 591, 606–07, 929 A.2d at 560, 569, we ordered disbarment when an attorney created several shell entities, to which she transferred her parents' various properties, and also orchestrated the fraudulent conveyance of $196,000 to relatives in Korea, to avoid a judgment lien. *See also Byrd*, 408 Md. at 483, 485, 970 A.2d at 889, 891 (ordering disbarment when an attorney filed false business reports in his involuntary bankruptcy proceeding, thereby under-reporting his income, in violation of MRPC 8.4(c)); *Powell*, 369 Md. at 475, 800 A.2d at 790 (ordering disbarment when an attorney deposited personal and business funds in his escrow account, and an account titled

in the name of his deceased father to conceal assets from creditors, in violation of MRPC 8.4(c)); *Attorney Grievance v. Velasquez*, 301 Md. 450, 458–59, 483 A.2d 354, 358–59 (1984) (ordering disbarment when an attorney, with the purpose of hiding assets from the view of creditors, handled his personal and office financial affairs through his escrow account, in violation of the precursor to MRPC 8.4(c)).

The record is replete with instances in which Mr. Foltz engaged in a pattern of dishonesty, fraud, and deceit, in his unrelenting endeavors to conceal assets from the DeCenzos. He failed to respond to discovery requests for financial information, resulting in contempt proceedings for which he failed to appear, and the issuance of a body attachment. He created non-client sub-accounts within his escrow account to hide loan monies, funds from his property management business, and other personal funds. He fraudulently conveyed over $100,000 to himself and his wife from his corporations, coinciding with the DeCenzos' collection attempts, while claiming no income from his businesses. He improperly paid more than $170,000 in personal expenses from his pension account to avoid having a checking account titled in his own name, which would have been subject to attachment. Finally, he used corporate bank and credit accounts to pay for personal expenses, enabling him to claim he had no income or assets.

Mr. Foltz offered no mitigation, nor any extenuating circumstances, and Judge Howard found none, as neither do we. As a result, disbarment is warranted.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COST OF ALL TRANSCRIPTS, PURSUANT TO RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION.**