*Attorney Grievance Commission of Maryland v. Wayne Gordon Gracey*, AG No. 20, Sept. Term, 2015. Opinion by Battaglia, J.

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT**

Court of Appeals disbarred attorney who wrongfully withdrew money from clients' accounts without authorization, made fraudulent transactions through his bank account, failed to return unearned fees, failed to deposit funds into an attorney trust account, knowingly allowed his employees to solicit potential clients by telephone and in-person, knowingly made false statements in connection with a disciplinary matter and failed to timely respond to requests from Bar Counsel. MLRPC 1.15(a) and (e), 1.16(d), 5.3(c), 8.1(a) and (b) and 8.4(a), (b), (c) and (d).

Circuit Court for Baltimore County,
Maryland
Case No. 03-C-15-006503
Argued: March 3, 2016

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 20
September Term, 2015

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

WAYNE GORDON GRACEY

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Hotten
JJ.

Opinion by Battaglia, J.

Filed: May 20, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of this opinion.

Petitioner, the Attorney Grievance Commission of Maryland ("Commission"), through Bar Counsel, filed in this Court a Petition for Disciplinary or Remedial Action ("Petition") on May 27, 2015, against Respondent, Wayne Gordon Gracey, as a result of it having received complaints against Gracey from BB&T Bank, Daletia Chung and Catherine and Peter Adams. In its Petition, the Commission alleged that Respondent violated Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 1.15(a), (c) and (e) (Safekeeping Property);[1] 1.16(d) (Declining or Terminating Representation);[2] 5.3 (a),

---

[1] Rule 1.15 provides, in relevant part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

\* \* \*

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

\* \* \*

(e) When a lawyer in the course of representing a client is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall distribute promptly all portions of the property as to which the interests are not in dispute.

[2] Rule 1.16 provides, in relevant part:

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel,

(b) and (c) (Responsibilities Regarding Nonlawyer Assistants);[3] 7.3(a) (Direct Contact with

Prospective Clients);[4] 8.1(a) and (b) (Bar Admission and Disciplinary Matters);[5] and

surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

[3] Rule 5.3 provides, in relevant part:

With respect to a nonlawyer employed or retained by or associated with a lawyer: (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer; (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action[.]

[4] Rule 7.3 provides, in relevant part:

(a) A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted:
(1) is a lawyer; or
(2) has a family, close personal, or prior professional relationship with the lawyer.

[5] Rule 8.1 provides, in relevant part:

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority,

2

8.4 (a), (b), (c), and (d) (Misconduct).[6]

Pursuant to Maryland Rules 16-752(a) and 16-757(c),[7] this Court designated the Honorable Judge Susan Souder ("the hearing judge") to hear the matter and make findings of fact and conclusions of law. On August 14, 2014 Gracey was served with the Petition, our Order, Petitioner's First Set of Interrogatories, Petitioner's First Request for Production of Documents and Petitioner's First Request for Admission of Fact and Genuineness of Documents to which Bar Counsel requested that Gracey answer within ten days. Gracey

---

except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

[6] Rule 8.4 provides, in relevant part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

[7] Rule 16-752(a) provides:

Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

Rule 16-757(c) provides:

The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

did not respond and Bar Counsel sent another letter on September 9, 2014 requesting that Gracey respond to the complaint within seven days to which Gracey responded. Gracey also failed to respond to another request from Bar Counsel which requested copies of the client file for the Adamses and trust account records demonstrating that the legal fees were held in trust.

The hearing judge conducted an evidentiary hearing on December 9 and 10, 2015 during which Bar Counsel presented testimony from Daletia Chung and Catherine Adams. Gracey represented himself and testified on his own behalf. In addition, both Bar Counsel and Gracey submitted substantial documentation, which was received in evidence, including Gracey's bank records from BB&T Bank, various correspondence between Ms. Chung and the Gracey Law Firm and between Ms. Chung and her bank, as well as a retainer agreement and various correspondence between the Adamses and the Gracey Law Firm.

The essence of BB&T Bank's complaint was that Gracey defrauded it of $24,683 by creating payments for services not rendered for fictitious client accounts which were deposited into one of seven checking accounts opened by Gracey for which he was the sole signatory and none of which was an attorney trust account; deposits in these accounts were subject to almost immediate withdrawal, because the Bank permitted the use of an electronic network for direct payment known as the "Automated Clearing House" ("ACH").[8] Between November 2013 and May 2014, $191,117 in ACH deposits were made

---

[8] The National Automated Clearing House Association (NACHA) explains the ACH process as:

4

by Gracey's firm to one of Gracey's seven checking accounts, but $184,035 of the deposits were later returned/rejected by BB&T as uncollectible. The majority of the rejected deposits had been from two fictitious individuals: "Yasmine Toye" and a "Richard Jones" who allegedly owed Gracey money and for which payments were being made. After the fraudulent deposits were made and Gracey's account was credited, the money was withdrawn almost immediately from Gracey's account before the bank noticed the error several days later and reversed the credit. The process of defrauding the Bank was repeated to continuously inflate Gracey's account balance.

Another complaint from Daletia Chung alleged that Gracey deducted funds from Ms. Chung's bank account; Ms. Chung had been a client of Mid Atlantic Regional Law, a

---

1. An Originator–whether that's an individual, a corporation or another entity– initiates either a Direct Deposit or Direct Payment transaction using the ACH Network. ACH transactions can be either debit or credit payments and commonly include Direct Deposit of payroll, government and Social Security benefits, mortgage and bill payments, online banking payments, person-to-person (P2P) and business-to-business (B2B) payments, to name a few.
2. Instead of using paper checks, ACH entries are entered and transmitted electronically, making transactions quicker, safer and easier.
3. The Originating Depository Financial institution (ODFI) enters the ACH entry at the request of the Originator.
4. The ODFI aggregates payments from customers and transmits them in batches at regular, predetermined intervals to an ACH Operator.
5. ACH Operators (two central clearing facilities: The Federal Reserve or The Clearing House) receive batches of ACH entries from the ODFI.
6. The ACH transactions are sorted and made available by the ACH Operator to the Receiving Depository Financial Institution (RDFI).
7. The Receiver's account is debited or credited by the RDFI, according to the type of ACH entry. Individuals, businesses and other entities can all be Receivers.

NACHA, ACH Network: How it Works (April 13, 2016), https://www.nacha.org/ach-network (https://perma.cc/28BK-SZFQ).

firm with which Gracey had previously been associated. Ms. Chung had never signed a retainer agreement or written authorization for Gracey to charge her account. Similarly, a complaint from Catherine and Peter Adams asserted that Gracey deducted money from their account despite their instruction not to withdraw any.

## I. Judge Souder's Findings of Fact and Conclusions of Law

On December 22, 2015, Judge Souder issued written findings of fact and conclusions of law. Judge Souder concluded, based on clear and convincing evidence, that Respondent violated MLRPC 1.15(a) and (e), 1.16(d), 5.3(c), 8.1(a) and (b), and 8.4(a), (b), (c) and (d). Bar Counsel abandoned the allegation that Gracey violated Rule 7.3 at the evidentiary hearing and "asserted instead that Respondent's employee violated Rule 7.3 and Respondent violated Rule 5.3."

Judge Souder's Findings of Fact and Conclusions of Law state:

Respondent is proud of his admission to the Maryland Bar in January 1985. He became a lawyer to help people; and, he has found assisting clients in terrible financial distress a rewarding career. It was undisputed that Respondent has assisted many clients without being paid for his services. This grievance proceeding is the first one filed against Respondent in his thirty years of practice.

In April 2013, Respondent began working at the Mid Atlantic Regional Law Group, LLC ("MAR"). MAR closed in August of 2013, and Respondent established Wayne Gordon Gracey Esquire and Associates, LLC (hereinafter "the Firm"). Respondent employed nearly all of the employees from MAR, including Kurt Rehak, Chamari Willis, Eric Kiik, Sang Yi, and Warren Gantt. The Respondent also obtained certain property from MAR, including computers containing client information, physical client files, software, databases, MAR's phone number, and email addresses.

With Respondent's knowledge, Respondent's employees, including Mr. Gantt, Mr. Rehak, and Mr. Willis, directly solicited potential clients by telephone, met with those potential clients in-person, explained the bankruptcy process, explained the Firm's retainer agreement, signed clients up, and sometimes collected money from those clients. Respondent was

6

aware that this direct solicitation of clients was wrong, but did not put a stop to the solicitation because he did not know how to generate sufficient income without violating the Maryland Lawyers' Rules of Professional Conduct.

### Complaint from BB&T

On November 1, 2013, Respondent and Mr. Rehak went to BB&T Bank and opened multiple bank accounts, many of which had corresponding ATM/debit cards. Respondent was the only signatory on those bank accounts.

BB&T offered a service which provided that transfers from Automated Clearing House (or "ACH") deposits would be almost immediately available for use by the Firm. At Mr. Rehak's insistence, Respondent's Firm took advantage of this service. Between November 2013 and May 2014, $191,117 in electronic transfers were deposited into Respondent's BB&T accounts, $184,035 of which were returned for "no account/cannot locate." In other words, Respondent's employees electronically communicated to BB&T that a credit card or its information was provided to the Firm in payment of services and BB&T credited the Firm's account in the amount of the payment almost immediately. Once the bank credited the Firm's account with the amount of the ACH deposit, Respondent's employee(s) would quickly transfer the funds to another Firm account. Checks and/or withdrawals then spent the amounts generated by these fraudulent transactions. In fact, the credit card information provided to BB&T was not accurate and in many instances there was no actual credit card account as communicated by the Firm.

On multiple occasions, the Firm advised BB&T it had received payments by way of credit cards from a "Yasmine Toye" and a "Richard Jones." The individuals were fictitious. The multiple deposits for "Yasmine Toye" totaled $140,519. Credits for "Toye" and "Jones" totaled $166,519 of the $184,035 returned, or rejected, transactions with BB&T.

Respondent recognized that something was not right with the Toye transactions, and Respondent asked Mr. Rehak to stop making the deposits; but, the deposits continued. Respondent did not know who Richard Jones was, and he noticed that the deposits from Richard Jones were being returned for "no account/cannot locate," but Respondent did not question Mr. Rehak about the returns, nor did Respondent investigate the transactions.

Respondent reviewed the Firm's bank accounts regularly, and saw that there were often low or negative balances in the accounts. Respondent knew that funds from ACH deposits became available almost immediately. Respondent did question Mr. Rehak about the bank account activity, including the large number of returned items; but, Respondent did not terminate Mr. Rehak's employment because the Firm was operating out of Mr. Rehak's basement. Respondent also did not stop Mr. Rehak from accessing bank accounts, from managing the Firm's finances, or from

7

soliciting clients. BB&T closed Respondent's bank accounts in June 2014. Due to the fraud scheme carried on by ACH deposits from accounts that did not exist or could not be located, BB&T suffered a loss of $24,683. Respondent has not made any restitution payments to BB&T.

Respondent used thousands of dollars from the BB&T accounts, which had been artificially inflated by the fraud scheme that was perpetrated by Respondent and his employees. From Respondent's payroll account (account number ending in 5629), Respondent signed and then cashed or deposited over $11,000 in checks to himself personally. From Respondent's expense account (account number ending in 5653), Respondent wrote checks payable to himself. In addition, from Respondent's filing fee account (account number ending in 2267), Respondent also wrote checks payable to himself; and, Respondent did not note that the checks were for any client matter or associate the checks with any client. From Respondent's operating account (account number ending in 5491), Respondent made and endorsed numerous cash withdrawals, without making any indication as to the purpose of the funds. Despite the number of accounts that Respondent maintained, none was a client trust account.

### Complaint from Daletia Chung

Ms. Daletia Chung retained MAR in September 2012, and pursuant to her retainer agreement, MAR deducted $100 from Ms. Chung's bank account each month for the retainer. In June 2013, MAR increased the deductions to $115 per month. Beginning in October 2013, Respondent began to deduct funds from Ms. Chung's account on a monthly basis, even though Ms. Chung had not signed a retainer agreement with Respondent and Respondent had no written authorization to charge Ms. Chung's account.

In March 2014, Ms. Chung advised Respondent that there had been wrongful withdrawals from her account and that she had never been informed that her file was transferred to the Firm. She requested a refund. Mr. Kiik responded that Ms. Chung did not have an agreement with the Firm, and that she would need to contact someone from MAR about withdrawals by MAR. Mr. Kiik also represented that the Firm had obtained Ms. Chung's credit report, which he sent to Ms. Chung, and had reviewed her file. In fact, the credit report the Firm provided to Ms. Chung was the same credit report that MAR had obtained in September 2012. The Firm provided Ms. Chung with a retainer agreement; but, Ms. Chung never signed the agreement. Mr. Kiik informed Ms. Chung that the Firm could only refund Ms. Chung the amounts that the Firm had withdrawn from her account; but, the Firm never provided any refund to Ms. Chung. Recognizing that the Firm was not authorized to withdraw funds from her account, Ms. Chung's bank refunded her the $501 that Respondent's Firm had withdrawn.

Respondent reviewed emails between Ms. Chung and Mr. Kiik, and was aware that there was a fee dispute. Respondent took no steps to resolve

8

the matter, did not provide a refund to Ms. Chung, and did not deposit the disputed amount into a client trust account. Respondent admitted that the funds withdrawn from Ms. Chung's account were not deposited or maintained in trust, and there was no informed consent confirmed in writing from Ms. Chung to deposit the funds in a non-trust account.

In response to a letter from Bar Counsel, by letter dated June 6, 2014, Respondent stated that his Firm did some preliminary work on Ms. Chung's case including obtaining her credit report and providing it to her. Respondent attached to this letter a copy of Ms. Chung's credit report, which was dated September 6, 2012. This credit report was obtained by MAR, not Respondent's Firm.

### Complaint from Peter and Catherine Adams

In January 2014, Mr. Peter Adams received a phone call from Mr. Gantt, soliciting employment for Respondent's Firm. Mr. Gantt visited the Adamses' home on January 21, 2014, at which point he obtained information regarding the Adamses' assets, expenses, monthly bills, and bank account information. At that time, Ms. Catherine Adams signed a retainer agreement, stating that no deductions should be made from her bank account until she authorized them. At the time Ms. Adams signed the retainer agreement, the portion of the agreement which provided debit amounts that would be made from her account was left blank. Ms. Adams requested copies of the documents she had signed, but none were provided to her.

Though the Adamses signed the agreement, they did not date it, and did not authorize any charges on any specific dates. Rather, Ms. Adams said she would call the Firm when funds were available to authorize payment. Ms. Adams wrote letters to the Firm, dated January 21, 2014 and February 7, 2014. It was disputed whether the first of these letters was actually sent, and the letters were contradictory as to whether the Adamses were decidedly hiring the Firm; but, both letters were clear that the Firm was not to withdraw any money until the Adamses provided authorization. Respondent also contacted the Adamses by telephone, and requested to begin debiting their account, which the Adamses did not authorize. Despite this, Respondent's Firm debited $350 from the Adamses' account. This $350 was not deposited and maintained in a trust account, and it was not deposited in a trust account at the time a fee dispute arose with the Adamses in March 2014. By check dated January 18, 2015, approximately six months after Bar Counsel had contacted Respondent about the Adamses' complaint, Respondent refunded $250 to the Adamses. The balance of $100 was not refunded. Respondent also never provided the Adamses with a copy of their retainer agreement, as they requested, their credit report, or any other documents.

In response to an inquiry from Bar Counsel, by letter dated April 11, 2014, Respondent provided a retainer agreement signed by the Adamses, which stated that a retainer of $500 was paid in February 2014, the specific

9

date being unclear. By letter dated June 20, 2014, Respondent provided to Bar Counsel another copy of a retainer agreement signed by the Adamses, which stated that a retainer of $350 was paid on February 21, 2014. With the exception of these hand-written monetary amounts, the agreements are identical. With these Retainer Agreements, Respondent also provided copies of Written Authorization to Charge Forms, which Ms. Adams signed on January 23, 2014. Both forms show monetary amounts and dates to be charged, but these monetary amounts and dates were not filled in on the form when Ms. Adams signed it.

By letter dated June 10, 2014, Bar Counsel requested copies of the Adamses' client file and trust account records demonstrating that the legal fees were held in trust. The letter also requested that Respondent provide the refund check to the Adamses to the Attorney Grievance Commission, for forwarding to the Adamses. Respondent failed to respond to these demands.

By letter dated August 21, 2014, Bar Counsel notified Respondent that the AGC received a complaint against Respondent from the Adamses, and requested that Respondent respond to the allegations in the complaint within ten days. Respondent failed to respond to this request. By letter dated September 9, 2014, Bar Counsel notified Respondent that no response had been received, and requested Respondent to reply within seven days. Respondent's response was dated September 12, 2014, and was received by the AGC on September 15, 2014.

The Conclusions of Law made by Judge Souder were as follows:

Petitioner alleged that Respondent violated the following Maryland Lawyers' Rules of Professional Conduct ("Rules"): 1.15 ("Safekeeping Property"), 1.16 ("Declining or Terminating Representation"), 5.3 ("Responsibilities Regarding Nonlawyer Assistants"), 8.1 ("Bar Admission and Disciplinary Matters"), and 8.4 ("Misconduct").[1]

_____

[1] In the Petition, Petitioner also alleged that Respondent violated Rule 7.3 ("Direct Contact with Prospective Clients"), but Petitioner abandoned this allegation at the December 10, 2015 proceeding, asserting instead that Respondent's employees violated Rule 7.3 and Respondent violated Rule 5.3.

_____

This Court finds that there is clear and convincing evidence that Respondent violated each of these Rules.

With respect to Rule 1.15, Respondent failed to deposit funds collected from the Adamses and from Ms. Chung into a client trust account, which is a violation of Rule 1.15(a). Respondent also failed to keep separate

10

the funds withdrawn from the Adamses' account and from Ms. Chung's account when disputes arose as to those funds, as was required by Rule 1.15(e).

Respondent became aware of the fee dispute with the Adamses on or about March 10, 2014, but Respondent did not refund any of the fee they had paid until approximately ten months later, in violation of Rule 1.16(d). Furthermore, Respondent refunded only $250 at that time, and never refunded the remaining $100, which represented an advance fee or expense that Respondent had not earned. Respondent also did not provide the Adamses with any of the documents they had signed, to which they were entitled. Accordingly, Respondent violated Rule 1.16(d).

Rule 7.3 prohibits lawyers from, by in-person, live telephone, or real-time electronic contact, soliciting professional employment from prospective clients when a significant motive is the lawyer's pecuniary gain, unless the prospective client is a lawyer or has a family, personal, or prior professional relationship with the lawyer. Warren Gantt, a non-attorney employee of Respondent, solicited the Adamses by telephone and in-person. Respondent was aware that Mr. Gantt, as well as Mr. Rehak and Mr. Willis, were soliciting clients by telephone and in-person, but Respondent did not stop the solicitation process. Thus, Respondent violated Rule 5.3(c), which makes lawyers responsible for the conduct of their nonlawyer employees that would be a violation of the Rules if engaged in by a lawyer, if the lawyer knows about and ratifies the conduct.

In response to inquiry from Bar Counsel, by letter dated April 11, 2014, Respondent attached a copy of a retainer agreement signed by the Adamses. In response to another inquiry from Bar Counsel, by letter dated June 20, 2014, Respondent provided a copy of a retainer agreement signed by the Adamses that differed from the one provided in April. Because it is necessary that either one or both of these retainer agreements was false or was altered in some way, Respondent violated Rule 8.1(a) because he knowingly made a false statement of material fact in connection with a disciplinary matter. Respondent also violated Rule 8.1(a) when, by letter dated June 6, 2014, Respondent represented to Bar Counsel that his Firm had pulled Ms. Chung's credit report at her request. Respondent attached a copy of the credit report his Firm had allegedly pulled for Ms. Chung, but the report was the same report that had been pulled by MAR in 2012.

Respondent violated Rule 8.1 (b) by failing to respond to lawful demands for information from a disciplinary authority. Bar Counsel notified Respondent, via letter dated August 21, 2014, that the AGC had received a complaint against Respondent, and requested that Respondent answer the complaint within ten days. After receiving another request from Bar Counsel, by letter dated September 9, 2014, that Respondent respond to the complaint within seven days, Respondent submitted a response to the complaint. Bar

Counsel also requested, by letter dated June 10, 2014, that Respondent provide copies of the client file for the Adamses and trust account records demonstrating that the legal fees were held in trust. Respondent failed to provide Bar Counsel with the requested information, in violation of Rule 8.1(b).

Because Respondent violated Rules 1.15, 1.16, 5.3, and 8.1, Respondent also violated Rule 8.4(a). *Attorney Grievance Commission v. Nelson*, 425 Md. 344, 363 (2012) ("Rule 8.4(a) is violated when other Rules of Professional Conduct are breached").

Respondent wrote over $11,000 in checks to himself from the Firm's payroll account. The checks were signed by Respondent, made payable to Respondent, and were cashed or deposited by Respondent. Furthermore, Respondent wrote checks payable to himself from the Firm's expense account. Also, Respondent wrote checks to himself from the Firm's filing fee account, and there was no corresponding deposit or client associated with those checks. There were numerous cash withdrawals from the Firm's operating account, which were endorsed by Respondent, and which have no associated client nor any indication of the purpose of the funds. It appears that Respondent may have profited from the Firm. There was no clear and convincing evidence regarding what, if any, amounts were improperly paid to Respondent. The Court cannot presume that checks from the various bank accounts were wrongfully paid to Respondent.

Respondent violated Rule 8.4(b) and Rule 8.4(c) by withdrawing $350 from the Adamses' bank account without their written authorization and $501 from Ms. Chung's bank account without her authorization. Respondent also agreed to provide refunds to Ms. Chung and the Adamses; but, his Firm only refunded the Adamses $250 and did not provide any refund to Ms. Chung. Finally, Respondent's Firm made fraudulent ACH transactions by repeatedly making deposits from fictitious persons Yasmine Toye and Richard Jones, which were returned. In total, there was a loss of $24,683 to BB&T. This also constitutes a violation of Rule 8.4(b) and Rule 8.4(c).

Respondent's misappropriation of funds from the Adamses and Ms. Chung, and Respondent's fraudulent BB&T account activity is conduct prejudicial to the administration of justice, in violation of Rule 8.4(d). *See Attorney Grievance Commission v. Seltzer*, 424 Md. 94, 111 (2011).


## II. Standard of Review

We recently again articulated our oft-cited standards for reviewing attorney disciplinary proceedings in *Attorney Grievance v. Hodes*, 441 Md. 136, 168, 105 A.3d 533, 552 (2014) as:

> This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland. We conduct an independent review of the record and we accept the hearing judge's findings of fact unless shown to be clearly erroneous. Under our independent review of the record, we must determine whether the findings of the hearing judge are based on clear and convincing evidence. With respect to exceptions, upon our review of the record, the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous. A hearing judge's factual finding is not clearly erroneous if there is any competent material evidence to support it. As to the hearing judge's conclusions of law, such as whether provisions of the Maryland Rules of Professional Conduct were violated, our consideration is *de novo*.

(internal citations omitted) (internal quotations omitted).

Bar Counsel did not file any exceptions to Judge Souder's findings of fact or conclusions of law. Gracey filed a Response to Recommendations for Sanctions and Exceptions to Judge Souder's findings of fact and conclusions of law, suggesting that there was no proof of dishonesty or criminal behavior on his part but only on the part of "dishonest employees and negligent action by certain employees without the immediate knowledge of the Respondent."

### III. Gracey's Exceptions to Findings of Fact

Gracey initially disagrees with Judge Souder's finding that there was a "scheme involving the Respondent to defraud the Bank." Regarding Gracey's accounts with BB&T Bank, Judge Souder found:

> On multiple occasions, the Firm advised BB&T it had received payments by way of credit cards from a "Yasmine Toye" and a "Richard Jones." The individuals were fictitious. The multiple deposits for "Yasmine Toye" totaled

$140,519. Credits for "Toye" and "Jones" totaled $166,519 of the $184,035 returned, or rejected, transactions with BB&T.

Respondent recognized that something was not right with the Toye transactions, and Respondent asked Mr. Rehak to stop making the deposits; but, the deposits continued. Respondent did not know who Richard Jones was, and he noticed that the deposits from Richard Jones were being returned for "no account/cannot locate," but Respondent did not question Mr. Rehak about the returns, nor did Respondent investigate the transactions.

Respondent reviewed the Firm's bank accounts regularly, and saw that there were often low or negative balances in the accounts. Respondent knew that funds from ACH deposits became available almost immediately. Respondent did question Mr. Rehak about the bank account activity, including the large number of returned items; but, Respondent did not terminate Mr. Rehak's employment because the Firm was operating out of Mr. Rehak's basement. Respondent also did not stop Mr. Rehak from accessing bank accounts, from managing the Firm's finances, or from soliciting clients. BB&T closed Respondent's bank accounts in June 2014. Due to the fraud scheme carried on by ACH deposits from accounts that did not exist or could not be located, BB&T suffered a loss of $24,683.

In support of his exception, Gracey argues that "violations were the direct result of dishonest employees and negligent action by certain employees without the immediate knowledge of the Respondent" and that "ACH payments were being handled by employee Kurt Rehak."

Bank records from BB&T submitted into evidence showed that Gracey opened seven bank accounts for which he was the only signatory and for which he reviewed records regularly. Gracey testified that he was aware of various of the fraudulent transactions and that he told Mr. Rehak to stop, but even as Gracey continued to monitor the accounts, the fraudulent payments continued; it was only when BB&T closed Gracey's bank accounts in

14

June 2014 that the activity stopped. There was, thus, clear and convincing evidence that Gracey was aware of the scheme to defraud the bank and participated in it.[9]

Gracey also demurs from the finding that he never provided a refund to Ms. Chung when he states that, "Ms. Chung DID receive all of her money refunded as a credit to her account and it became a charge back to Respondents account. SO the allegations that she did not receive her money back is NOT TRUE." (Emphasis in original). The evidence at the hearing reflected that PNC Bank, which was Ms. Chung's bank, refunded her the money for the charges attributable to Gracey, but there was no evidence adduced that reflected Gracey reimbursed PNC Bank nor Ms. Chung. Judge Souder's finding that Gracey did not provide a refund to Ms. Chung was supported by clear and convincing evidence.

Gracey also excepts to Judge Souder's finding that the Adamses "did not authorize any charges on any specific dates." Gracey asserts that money "was debited from [the Adamses's] account in accordance with [their] agreement."

Mrs. Adams testified that while she signed a retainer agreement she intentionally left the amount to be charged blank and specifically requested that no money be deducted from her account until the couple told him to:

> [MRS. ADAMS]: [W]e didn't have the money at the time. . . . So we said we would let him know when he would be able to take out the money because

---

[9] Gracey appears to be excepting from the findings of fact when he states that he derived no benefit from the scheme. Judge Souder, however, never made a finding of a personal benefit to Gracey when she stated, "The Court cannot presume that checks from the various bank accounts were wrongfully paid to Respondent."

we wanted to make sure that the money was in the account so that we wouldn't be going into overdraft.

[PETITIONER]: And was there an agreement as to the date that the first payment would be withdrawn from the bank account?

[MRS. ADAMS]: There was no date. We said we would contact him when the money would be able to come out. We didn't give him a date because we wasn't – we wanted to make sure that the other bills were taken care of before he would start taking money out of the account.

Judge Souder's finding that the Adamses did not authorize Gracey to charge their account was supported by clear and convincing evidence.

### IV. Gracey's Exceptions to Conclusions of Law

Gracey also filed exceptions to Judge Souder's Conclusions of Law in which she determined that Gracey violated a number of our Rules of Professional Conduct. We review the hearing judge's conclusions of law *de novo*, addressing each of Gracey's exceptions.

Gracey asserts that, "With regard to rule 1.15 the clients signed a retainer for a flat fee arrangement indicating fees were earned as received" so that deposit into a trust account may not have been necessitated.[10] Judge Souder determined that, "Respondent failed to deposit funds collected from the Adamses and from Ms. Chung into a client trust account, which is a violation of Rule 1.15(a)" and rejected the notion that the fees were earned because Gracey was not entitled to the fees taken from the Adamses nor from Ms. Chung.

---

[10] Seemingly, Gracey is relying on Rule 1.15(c) which provides that, "Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred." No evidence was adduced regarding consent by either the Adamses or Ms. Chung to fees yet unearned being deposited in an operating account.

16

Rule 1.15(a) states:

> A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

We have stated that, "an attorney *must* communicate the risks associated with a fee arrangement that varies from the standard escrow arrangement," and Rule 1.15 is violated when "[n]either the retainer agreement, nor [the Respondent] personally, explained the material risks associated with entering into an 'earned upon receipt' fee agreement". *Attorney Grievance Comm'n of Maryland v. Chapman*, 430 Md. 238, 277, 60 A.3d 25, 48-49 (2013), reinstatement granted sub nom. *In re Reinstatement of Chapman*, 434 Md. 317, 75 A.3d 321 (2013).

Judge Souder further concluded that, "Respondent also failed to keep separate the funds withdrawn from the Adamses' account and from Ms. Chung's account when disputes arose as to those funds, as was required by Rule 1.15(e)." Rule 1.15(e) states:

> When a lawyer in the course of representing a client is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall distribute promptly all portions of the property as to which the interests are not in dispute.

"The rule is unambiguous: an attorney may not withdraw a portion of the deposited funds when the attorney's right to receive that portion is 'disputed' by the client." *Attorney*

*Grievance Comm'n of Maryland v. Calhoun*, 391 Md. 532, 568, 894 A.2d 518, 540 (2006). As both the Adamses and Ms. Chung disputed Gracey's right to the money and Gracey did not "escrow" their fees, Gracey violated Rule 1.15(e).

The next exceptions Gracey interposes are to Judge Souder's conclusions that he violated Rules 1.16(d), 5.3(c) and 8.4(a), (b), (c) and (d), because he argues that, "activities were done without the direct knowledge of the Respondent and without being timely informed."

With respect to Rule 1.16(d), Judge Souder determined that, "Respondent became aware of the fee dispute with the Adamses on or about March 10, 2014, but Respondent did not refund any of the fee they had paid until approximately ten months later, in violation of Rule 1.16(d)." Judge Souder also determined that Gracey violated Rule 1.16(d) because he "did not provide the Adamses with any of the documents they had signed, to which they were entitled." Rule 1.16(d) states:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

We have stated that, "Failure to return unearned fees and papers violates [Rule 1.16(d)]" *Attorney Grievance Comm'n of Maryland v. Hamilton*, 444 Md. 163, 191, 118 A.3d 958, 974 (2015); thus, Gracey violated Rule 1.16(d).

Judge Souder also determined that Gracey's employees solicited clients by phone and in-person, a violation of Rule 7.3, if done by Gracey. Gracey, therefore, violated Rule

18

5.3(c), which states that, "a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if . . . [the lawyer] knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action". *See Attorney Grievance Comm'n of Maryland v. Smith*, 443 Md. 351, 383, 116 A.3d 977, 995 (2015) (An attorney violates 5.3(c) when he or she has "knowledge of the misconduct" and fails to take "reasonable remedial measures."). As Gracey knew of the solicitation practice and allowed it to continue, he violated Rule 5.3(c).

Judge Souder also concluded that Gracey "violated Rule 8.4(b) and Rule 8.4(c) by withdrawing $350 from the Adamses' bank account without their written authorization and $501 from Ms. Chung's bank account without her authorization" and when "Respondent's Firm made fraudulent ACH transactions by repeatedly making deposits from fictitious persons Yasmine Toye and Richard Jones, which were returned." Rule 8.4(b), states that: "It is professional misconduct for a lawyer to: * * * (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects". "It is well established that a conviction is not required to find a violation of MLRPC 8.4(b)." *Attorney Grievance Comm'n of Maryland v. Agbaje*, 438 Md. 695, 729, 93 A.3d 262, 282 (2014). The crux of the 8.4(b) analysis, rather, is "whether an attorney's criminal act 'reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects.'" *Id.* at 729-30, 93 A.3d at 282, quoting *Attorney Grievance Comm'n v. Thompson*, 367 Md. 315, 324, 786 A.2d 763 (2001). Gracey not only knew about the

scheme to defraud the bank, but also participated in it, as well as took money from Ms. Chung and the Adamses without authorization. Gracey violated Rule 8.4(b).

Rule 8.4(c) states that, "It is professional misconduct for a lawyer to: * * * (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation". Gracey violated Rule 8.4(c) for the same reasons that he violated 8.4(b).

Judge Souder also determined that, "Respondent's misappropriation of funds from the Adamses and Ms. Chung, and Respondent's fraudulent BB&T account activity is conduct prejudicial to the administration of justice, in violation of Rule 8.4(d)." Rule 8.4(d) states that, "It is professional misconduct for a lawyer to: * * * (d) engage in conduct that is prejudicial to the administration of justice". The fraudulent activity in which Gracey engaged with respect to the ACH transactions and the charges to the Adamses and Ms. Chung is "prejudicial to the administration of justice" in violation of Rule 8.4(d). *Attorney Grievance Comm'n of Maryland v. Kum*, 440 Md. 372, 385, 102 A.3d 777, 784 (2014).

Having overruled Gracey's other exceptions we also agree that Gracey violated Rule 8.4(a) which is "violated when other Rules of Professional Conduct are breached." *Attorney Grievance Comm'n of Maryland v. Nelson*, 425 Md. 344, 363, 40 A.3d 1039, 1050 (2012).

Judge Souder, finally, determined that Gracey violated Rule 8.1(a) because he provided two conflicting retainer agreements for the Adamses in response to inquiries from Bar Counsel and that, "it is necessary that either one or both of these retainer agreements was false or was altered in some way, [thus], Respondent violated Rule 8.1(a) because he knowingly made a false statement of material fact in connection with a disciplinary

20

matter." Judge Souder also concluded that, "Respondent also violated Rule 8.1(a) when, by letter dated June 6, 2014, Respondent represented to Bar Counsel that his Firm had pulled Ms. Chung's credit report at her request" when in fact they had not and Ms. Chung had not so requested. Judge Souder also concluded that, "Respondent failed to provide Bar Counsel with . . . requested information, in violation of Rule 8.1(b)" when he failed to timely respond to the initial complaint and failed to provide copies of the client file for the Adamses and trust account records.

Rule 8.1 provides:

> An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

Providing altered documents and false statements of material value to Bar Counsel are violations of Rule 8.1(a). *Attorney Grievance Comm'n of Maryland v. Mitchell*, 445 Md. 241, 260, 126 A.3d 72, 83 (2015). Failing to respond to Bar Counsel's lawful request for information is a violation of Rule 8.1(b). *Attorney Grievance Comm'n of Maryland v. Williams*, 446 Md. 355, 375, 132 A.3d 232, 244 (2016).

## V. Sanctions

Gracey's professional misconduct is deserving of the ultimate sanction of disbarment. We consequently issued a Per Curiam Order disbarring Gracey on March 3, 2016.

21

Although Judge Souder did not find personal benefit to Gracey from the acts by which BB&T, the Adamses and Ms. Chung were defrauded, he did participate in the dishonest conduct by knowing and willful blindness with respect to his monitoring of the firm's accounts and with his commensurate failure to supervise his employees who facilitated the scheme. The fraudulent ACH activity did not cease until BB&T closed the accounts, Ms. Chung had to contact her bank for a refund and the Adamses received compensation from the Client Protection Fund.

In *Attorney Grievance Comm'n of Maryland v. Vanderlinde*, 364 Md. 376, 414, 418, 773 A.2d 463, 485, 488 (2001), we determined that when an attorney engages in dishonest or fraudulent conduct such as stealing and intentional misappropriation of the funds of another as proscribed by Rules 8.4(a), (b) and (c), we do not discuss "degrees" of dishonesty, but generally order disbarment, absent compelling extenuating circumstances. Because dishonest conduct by a lawyer is beyond excuse, disbarment should ordinarily be the sanction:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.
> Disbarment ordinarily should be the sanction for intentional dishonest conduct.

*Id.* Gracey's supervisory behavior warranted disbarment. *Attorney Grievance Comm'n of Maryland v. Johnson & Purcell*, 409 Md. 470, 508, 976 A.2d 245, 267 (2009) (attorney's "acts as a supervisor . . . constituted clear misappropriation" warranting disbarment).

22

The fact that Rules 8.4(a), (b), (c) and (d) were violated also supports the imposition of the most severe sanction. *Attorney Grievance Comm'n of Maryland v. Foltz*, 411 Md. 359, 413, 983 A.2d 434, 466 (2009) ("8.4(a), (c), and (d) violations, in and of themselves, support a sanction of disbarment.").

Gracey participated in the scheme to defraud BB&T Bank, took money from clients and former clients without authorization and then provided altered documents and false statements to Bar Counsel in response to requests for information. Gracey's absence of a prior disciplinary record and the fact that there was no finding of personal benefit do not palliate our decision to disbar him. *Attorney Grievance Comm'n of Maryland v. Coppola*, 419 Md. 370, 411, 19 A.3d 431, 455 (2011) (disbarment ordered even though attorney did not profit from illicit behavior).